UNITED STATES of America ex rel.
John J. CARROLL, Appellant-
Petitioner,

v.

John F. McNEILL, Supt. of Matteawan
State Hospital, Appellee-Respondent.

No. 304, Docket 26731.

United States Court of Appeals
Second Circuit.

Argued March 10, 1961.

Decided July 26, 1961.

Melvin L. Wulf, New York City (Marvin M. Karpatkin, New York City, of counsel), for appellant-petitioner.

Louis J. Lefkowitz, Atty. Gen. of the State of New York (Isadore Siegel, Asst. Atty. Gen., of counsel), for appellee-respondent.

David N. Fields, New York City, amicus curiae, Association for Improvement of Mental Health, Inc.

Before LUMBARD, Chief Judge, and MAGRUDER and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge.

From September 26, 1950 to date the appellant, John Carroll, has been held in custody in Matteawan State Hospital (Matteawan), a New York State "hospital for insane criminals"[1] located within the Southern District of New York.

1. Sections of the New York statutes having specific reference to Matteawan are §§ 400–441, comprised within Article 16 of

Chapter 43 of the McKinney's Consolidated Laws. Chapter 43, denominated the "Correction Law," became law in

Appellant applied to the United States District Court for the Southern District of New York for the issuance of a writ of habeas corpus. He alleged that his detention in Matteawan is depriving him of his liberty without due process of law and is denying him the equal protection of the laws, and that therefore his detention is in violation of the Fourteenth Amendment of the United States Constitution. The petition was dismissed and an application for leave to appeal *in forma pauperis* was denied. Application for permission to appeal was then made to us. We granted the leave and, without opinion, remanded the case to the district court for a hearing upon the merits. After the hearing held upon remand the

petition was again dismissed. We issued a certificate of probable cause, and, pursuant to 28 U.S.C.A. § 2253, the within appeal was taken from that final order of dismissal.

In 1934 petitioner was convicted in the New York courts of the crime of robbery, second degree. He was sentenced to serve from two to four years in prison. He served his sentence and was discharged on March 17, 1938. Fifteen years after this conviction, on January 7, 1949, pursuant to an order of certification of a Justice of the New York State Supreme Court, issued under New York Mental Hygiene Law, § 74, Chapter 27 of McKinney's Consolidated Laws,[2] appellant was committed to Pilgrim State

1929 and was a general amendment of New York's former "Prison Law." The title of the 1929 Act was:

"An Act in relation to the correction and detention of persons in state correctional institutions, constituting chapter forty-three of the consolidated laws."

The first section within Article 16, § 400 as amended, reads as follows:

"Article 16—Matteawan State Hospital

"§ 400. Establishment and purpose of the Matteawan state hospital

"The grounds, buildings and property located at Beacon in the county of Dutchess, and used for the purpose of the hospital for insane criminals, shall continue to be known as the Matteawan state hospital, to be used for the purpose of holding in custody and caring for such insane persons held under any other than a civil process as may be committed to the said institution by courts of criminal jurisdiction, or transferred thereto by the commissioner of mental hygiene, and for such persons as may be committed thereto pursuant to the provisions of section eighty-five of the mental hygiene law, and for such convicted persons as may be declared insane while undergoing sentence of one year or less or for a misdemeanor at any of the various penal institutions of the state, and for all female convicts becoming insane while undergoing sentence. When a person is committed to the Matteawan state hospital under the provisions of section six hundred and sixty-two-b, section eight hundred and seventy two or section eight hundred and seventy-five of the code of criminal procedure; or section eighty-five of the mental hygiene law, a copy of

the minutes of the proceedings instituted to determine his mental condition shall be furnished to said hospital. *The department of correction shall have the jurisdiction and control of such hospital;* but it shall be subject to visitation and inspection of the head of the department of mental hygiene, by himself and his authorized representatives from the department of mental hygiene." (Emphasis ours.)

2. Chapter 27 of the Consolidated Laws is denominated the "Mental Hygiene Law." Chapter 27 was a general amendment and compilation of the laws relating to the commitment, care and treatment of insane and mentally defective persons, became law in 1927, and the title of the 1927 Act was:

"An Act relating to the mentally ill, mental defectives and epileptics, constituting chapter twenty-seven of the consolidated laws."

The Mental Hygiene Law contains the provisions of law applying to the administration of state hospitals for the mentally ill, such as Pilgrim. Section 74, a lengthy eight-paragraph section, sets forth in great detail the process and the hearing required for commitment to state mental hospitals, such as Pilgrim. Paragraph 1, the basic paragraph, which we believe is desirable to set forth for the clarity of the opinion, reads as follows:

"1. A person alleged to be mentally ill, and who is not in confinement on a criminal charge, may be certified to and confined in an institution for the care and treatment of the mentally ill, upon an order made by a judge of a court of record

Hospital (Pilgrim), one of several New York State hospitals existing for the care and treatment of the mentally ill of the state, an institution under the governance of the State Department of Mental Hygiene. Appellant does not challenge the propriety of this commitment order, or his continued detention thereafter at Pilgrim pursuant to a certificate of need of continued care and treatment, all as provided for in § 74. On December 21, 1949, appellant escaped from Pilgrim. The following day, December 22, 1949, the Senior Director of Pilgrim addressed a letter to the Commissioner of Mental Hygiene requesting that appellant be transferred to Matteawan pursuant to New York Correction Law, § 412, which provides:

"§ 412. Transfers from other state hospitals to Matteawan state hospital

"The commissioner of mental hygiene may, by order in writing, transfer to the Matteawan state hospital any insane inmate of another state hospital, who was held under any other than a civil process, committed thereto upon the order of a court of criminal jurisdiction or of a judge or justice of such a court; *or any patient who has previously been sentenced to a term of imprisonment in any correctional institution, and who still manifests criminal tendencies,* or any such patient who has previously been an inmate of the Matteawan state hospital. (Emphasis ours.)

"Any inmate who has been transferred to the Matteawan state hospital pursuant to this section may thereafter again be transferred to any appropriate institution in the

department of mental hygiene or the department of correction upon the order of the commissioner of mental hygiene and the consent of the head of the department having jurisdiction of the institution to which the inmate is to be transferred. The superintendent of Matteawan state hospital may discharge a patient who has recovered or who has improved so as to be no longer dangerous to himself or others. All persons committed to said Matteawan state hospital shall be a charge upon the state."

The director's letter, to which a copy of appellant's clinical summary was attached, referred to appellant's prior conviction and prison record and contained a statement that in the course of his escape from Pilgrim appellant had assaulted a hospital attendant and fractured his skull. The letter, therefore, classified appellant as one "who has previously been sentenced to a term of imprisonment in any correctional institution, and who still manifests criminal tendencies, * * *" On January 4, 1950, a written order was issued by the Department of Mental Hygiene authorizing the transfer of petitioner to Matteawan pursuant to § 412. Appellant was apprehended on September 23, 1950 and was returned to Pilgrim on September 25. The order of January 4 was then forthwith executed and on September 26, 1950 appellant was transferred to Matteawan where he has since remained.

Had it not been for petitioner's 1934 conviction for robbery, the only way in which petitioner could have been transferred to Matteawan in 1950 was pursuant to New York Mental Hygiene Law, § 85, the relevant parts of which are set forth in full in the margin.[3]

of the city or county, or a justice of the supreme court of the judicial district in which the alleged mentally ill person resides or may be, upon a certificate made by two examining physicians, accompanied by a petition therefor, or upon such certificate and petition, and after a hearing, as provided in this section."

3. The relevant parts of Section 85 provide:
"1. The director of any state hospital, upon order of the commissioner, upon ascertaining that any person, duly certified to and a patient of such hospital as a mentally ill person, has committed or is liable to commit an act or acts which if committed by a sane person would consti-

Section 85 provides for detailed judicial proceedings leading to a court certification that the mentally ill patient is dangerous and that the safety of the institutional environment requires his transfer to Matteawan. It provides that a commission of three disinterested persons shall examine the patient and report findings to the court. The patient is entitled to be represented by counsel during the proceedings. However, under New York Correction Law, § 412 these usual procedural safeguards are denied to a mentally ill patient who has been previously sentenced to a term of imprisonment in a correctional institution even though the determination that he is mentally ill is made after the completion of his criminal sentence. Such a patient, as appellant, may be transferred, summarily, without any hearing whatsoever, to Matteawan pursuant to § 412.

■ We are of the opinion that the denial of a judicial transfer procedure arbitrarily discriminates against those patients who have fully served prior sentences for crimes and have subsequently been admitted by civil process to a state institution of the type of Pilgrim, and denies to this class of patients the equal protection of the laws guaranteed to them by the Fourteenth Amendment.

■ During the hearing before the district judge, and during the argument on appeal, counsel for petitioner made efforts to distinguish the purpose of the two institutions. He correctly pointed out that Matteawan is denominated as a "hospital for insane criminals" and that Matteawan expressly does not deal with mentally ill persons committed into state custody by civil process, with the exception of those transferred from other institutions pursuant to the New York Mental Hygiene Law, § 85 and the New York Correction Law, § 412. See New York Correction Law, § 400, supra, footnote 1. Counsel attempted through wit-

---

tute homicide or felonious assault, or is so dangerously mentally ill that his presence in such a hospital is dangerous to the safety of other patients therein, the officers or employees thereof, or to the community, shall forthwith make application to a court of record or judge thereof within the county wherein such state hospital is located or a justice of the supreme court in the judicial district wherein such county is located for the appointment of a commission to determine the dangerous mental illness of such person, and the court may appoint a commission of not more than three disinterested persons to examine such person and report to the court as to his dangerous mental illness.

"2. The court or judge thereof to whom such application is made, shall cause one copy of the verified petition for the appointment of a commission to be served upon the district attorney of the county wherein such state hospital is located in such manner as the court shall direct.

"3. The commission must summarily proceed to make their examination. Before commencing they must take the oath prescribed in the civil practice act to be taken by referees. They may be attended by the district attorney of the county, and may call and examine witnesses and compel their attendance. The person whose dangerous mental illness is being inquired into may be represented by counsel in the proceedings. When the commissioners have concluded their examination they must forthwith report the facts to the court with their opinion thereon.

"4. If the commission find such person so dangerously mentally ill that his presence in a state hospital is dangerous to the safety of other patients therein, the officers or employees thereof, or to the community the court if in substantial agreement with the report and opinion of the commission must order that such person be admitted to the Matteawan state hospital, and direct the sheriff to take such person into his custody and deliver him to such Matteawan state hospital and be there confined pursuant to such order, and that upon his mental illness becoming no longer dangerous to safety he may be released as provided in the correction law or he may be transferred to any other hospital in the department upon the order of the commissioner.

"5. Certification to Matteawan state hospital pursuant to this section shall not be deemed as or received in any court in evidence of commission of a crime by the person so certified, nor shall such certification be deemed or considered a certification as punishment for a crime."

nesses to show that Matteawan partook more of the character of a jail than a hospital, and, among other claimed differences, sought to prove that the treatment accorded the mentally ill at Pilgrim was far superior to that offered at Matteawan. The state, however, introduced evidence which tended to prove that the treatment of the inmates at both institutions was similar, and that the only administrative difference between the two was the standard of security enforced at Matteawan. After weighing the evidence the district judge concluded that "Matteawan Hospital is a security institution but it is undoubtedly a hospital and not a jail." Although we may well have reached a contrary result if the original decision had been ours, we may not set aside this finding of fact based upon all the evidence, for the finding is not a "clearly erroneous" one, Fed.R. Civ.Proc. 52(a), 28 U.S.C.A.

However, the issue as to whether Matteawan is a hospital or a jail is not dispositive of the constitutional issue presented for our determination. The state argues that Matteawan is a hospital, and therefore is indistinguishable from any other mental hospital that is a part of the complex of New York state mental hospitals, and assuming, of course, that a patient initially has been legally committed, a transfer of that patient from one institution to another within that complex is merely an unreviewable administrative decision. But the statutes of the State of New York do not support the state's argument. As pointed out above, Matteawan, unlike Pilgrim and similar hospitals, is under the governance of the State Department of Correction and not the State Department of Hygiene, and is an institution existing for the purpose of caring for and having custody of insane criminals. It is of obvious importance in this connection to note that whereas no judicial procedures need be observed when a civilly committed patient is transferred from one state hospital for the mentally ill to another like hospital, New York has provided by a specific statute a specific detailed procedure to be followed when a civilly committed patient is transferred from one of these state hospitals to Matteawan. If Matteawan were not different from the other hospitals no such procedure would be necessary or prescribed. The conclusion is inescapable when one reads New York Correction Law, §§ 400–414 in connection with New York Mental Hygiene Law, § 85 that the State of New York has set Matteawan apart from the state mental hospitals administered by the Department of Mental Hygiene and that the distinctive purpose of Matteawan is to provide a maximum security institution to care for insane criminals and other mentally ill persons who are so dangerously insane that they pose a threat to the therapeutic community at the ordinary state mental hospitals. With the exception of those Section 412 transferees initially committed upon civil process to the care of the Department of Mental Hygiene, every patient legally at Matteawan is there pursuant to a court order specifically directing his commitment to the custody of the Department of Correction, or to Matteawan. A court order is even required when it is sought to transfer to Matteawan an incarcerated criminal who has become insane or has been found to be so while serving an unexpired sentence in a state correctional institution. New York Correction Law, § 408. See People ex rel. Brown v. Johnston, 9 N.Y.2d 482, 215 N.Y.S.2d 44. Only Section 412 transferees are denied hearings prior to confinement in Matteawan. Lacking such hearings transferees from ordinary mental hospitals have no opportunity to refute the charges upon which the Commissioner of Hygiene seeks to justify his orders so committing them. Consequently, it is clear that these transferees are being treated differently from other transferees similarly situated in that they are denied judicial hearings and to that extent are discriminated against.

A state may, of course, in the interest of effectuating its valid governmental policies, make reasonable classifications among its citizens whereby those

in one class may be treated differently from those in another. Walters v. City of St. Louis, Mo., 1954, 347 U.S. 231, 74 S.Ct. 505, 98 L.Ed. 660;[4] Goesaert v. Cleary, 1948, 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163;[5] MacDougall v. Green, 1948, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3; Kotch v. Board of River Port Pilot Com'rs, 1947, 330 U.S. 552, 67 S.Ct. 910, 9 L.Ed. 1093; Rapid Transit Corp. v. City of New York, 1938, 303 U.S. 573, 58 S.Ct. 721, 82 L.Ed. 1024; Great Atlantic & Pacific Tea Co. v. Grosjean, 1937, 301 U.S. 412, 57 S.Ct. 772, 81 L.Ed. 1193; Metropolitan Casualty Insurance Co. of New York v. Brownell, 1935, 294 U.S. 580, 55 S.Ct. 538, 79 L.Ed. 1070. However, in so doing, a state must guard against classifications which are so arbitrary that they are repugnant to the equal protection clause of the Fourteenth Amendment. Skinner v. State of Oklahoma, 1942, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655; State of Missouri ex rel. Gaines v. Canada, 1938, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208; Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220. The State of New York has not attempted to justify its discrimination under Correction Law, § 412 against ex-convicts. It is content to argue that the judicial hearing accorded the ex-convict at the initial civil commitment proceeding is the only judicial hearing that the Fourteenth Amendment requires.[6] However, patients sought to

4. "Equal protection does not require identity of treatment. It only requires that classification rest on real and not feigned differences, that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments be not so disparate, relative to the difference in classification, as to be wholly arbitrary." Walters v. City of St. Louis, Mo., 347 U.S. 231, at page 237, 74 S.Ct. 505, at page 509.

5. "The Constitution in enjoining the equal protection of the laws upon States precludes irrational discrimination as between persons or groups of persons in the incidence of a law. But the Constitution does not require situations 'which are different in fact or opinion to be treated in law as though they were the same.'" Goesaert v. Cleary, 335 U.S. 464 at page 466, 69 S.Ct. 198, at page 199.

6. The state relies upon People ex rel. Monaco v. McNeill, 1949, 299 N.Y. 605, 86 N.E.2d 176 a memorandum decision of the New York Court of Appeals affirming an order of a Justice of the Supreme Court.

From the State Reporter's account of the case, 299 N.Y. 605, 606, 86 N.E.2d 176, set forth in full in the Attorney General's brief we are told that the following facts underlie this memorandum decision. In 1929, petitioner, one Monaco, had "received a sentence of three years in a State reformatory," a correctional institution under the governance of the Department of Correction. On May 9, 1931, before that sentence had expired, Monaco was judicially adjudged by a Justice of the New York Supreme Court to be mentally ill and was ordered committed for treatment to a state hospital administered by the Department of Mental Hygiene, Central Islip, from which institution he was later, in 1934, transferred without a hearing, under § 412, to Matteawan. From the brief it would appear that the court below which twelve years later adjudicated upon the habeas corpus petition held that this transfer of Monaco raised no constitutional questions. No copy of this opinion and order has ever been handed us, and no citation as to where such can be found in any official reports has been furnished us. This opinion, an opinion of the Supreme Court of Dutchess County, New York, wherein Monaco's application for a writ of habeas corpus was dismissed, does not appear in any available compilation of judicial opinions; but the Court of Appeals Reporter's account sets forth that Monaco claimed § 412 to be unconstitutional in that his transfer pursuant to it deprived him of his liberty without due process of law. As we understand the Monaco case it is clearly distinguishable from the case before us both on its facts and as to the impact of the Fourteenth Amendment. There the patient at the time of his initial commitment to Central Islip was in a state reformatory serving a three year criminal sentence (or mayhap was physically out of the institution) under the governance of the Department of Correction. He was committed to Central Islip by a Justice of the Supreme Court, a court having general criminal jurisdiction, on just what process is not clear, before his criminal sentence had expired. His mental illness began while he was in the custody of the Department of Cor-

be transferred under Mental Hygiene Law, § 85 had been accorded initial judicial commitment hearings, and yet, in order to ascertain whether they are so dangerous that a transfer to the more secure institution of Matteawan is warranted, they are given second judicial hearings prior to being transferred there. The denial to ex-convicts of these second hearings wherein they may be confronted with the evidence demonstrating that their condition requires confinement in Matteawan and wherein they may put in evidence of contrary purport constitutes a discrimination against them that we are required to hold is an arbitrary one. We have attempted to find a possible reasonable basis for this discrimination and we find none. We find nothing to demonstrate that ex-convicts who, after expiration of their sentences, become mentally ill, are inherently more dangerous than those mentally ill who are not ex-convicts. In fact there are many "criminal tendencies" that are in no way violent tendencies just as there are many convicts and ex-convicts whose crimes were non-violent crimes. Nor, even if such an ex-convict should become dangerously insane, does there appear to be any justification for more hastily transferring him to Matteawan after his commission of a dangerous act at an ordinary mental hospital than in transferring any other patient who has committed such an act at such a hospital but whose transfer is nevertheless delayed until after he shall have had a judicial hearing.

We conclude, therefore, that unless New York Correction Law, § 412 can be read so that it requires that a hearing be granted to an ex-convict charged with criminal tendencies prior to his transfer by administrative order from an ordinary state mental hospital to Matteawan, we must hold that Section 412 is unconstitutional as applied to him. We cannot so read the section. Its plain language precludes us from reading into it the requirement that a hearing be held.

We express our gratitude to petitioner's counsel, who, appointed by the court below, has so ably advocated petitioner's cause.

We reverse the district court, grant the writ, and direct that the petitioner be discharged from Matteawan and returned to Pilgrim State Hospital, until the procedures set forth in New York Mental Hygiene Law, § 85 shall have been followed.

---

rection and, his insanity continuing, his return to the custody of that Department (if indeed he was not continued in the technical custody thereof while at Central Islip) raises no question comparable to that raised by Carroll in the case before us. Here, petitioner's mental illness originated after his criminal sentence had expired, indeed, eleven years thereafter, and he was not committed to Pilgrim State Hospital as a criminal but as any mentally ill person who had had no criminal record is committed, under Mental Hygiene Law, § 74. Moreover, the recent opinion of the New York Court of Appeals in People ex rel. Brown v. Johnston, supra, casts grave doubt upon whatever authority People ex rel. Monaco v. McNeill may be thought to have. In any event, rights under the United States Constitution are here at issue and as to them federal courts, though always instructed by the views of state courts, must discharge the final responsibility.