David O. Boehm, J.
A hearing pursuant to chapter V of title XII of part IV of the Code of Criminal Procedure was held over a period of three days to determine whether the defendant is competent to stand trial as defined in section 662-b of the Code of Criminal Procedure.
Indicted for the crime of rape, first degree, (Indictment No. 113, filed March 12, 1969), and for the crime of assault, first degree (Indictment No. 114, filed March 12, 1969), defendant has a long history of mental illness. From February 10, 1966 to April 3, 1970, the date of his last admission, defendant was hospitalized six separate times at the Rochester State Hospital with a diagnosis of schizophrenia, paranoid type. On one of these occasions, March 5, 1969, he was admitted on a criminal order after being charged with assault. At that time the defendant was found unable to stand trial and the following recommendation made: ‘ ‘ Evident that he requires long-term hospitalization and admission to Matteawan is indicated.” On April 16, 1969 the defendant was confined at Matteawan, and not released until a year later when he was returned to the Rochester State Hospital for the most recent question of his competence to stand trial.
The court heard testimony from Dr. Daniel Davis and Dr. Wellington Reynolds, psychiatrists and members of the staff of Rochester State Hospital. Dr. Reynolds is also on the staff of Attica State Prison. Testifying on behalf of the defendant were Dr. William Libertson and Dr. David Mactye, both psychiatrists, and the defendant, and his attorney, John Petrucelli.
Dr. Davis and Dr. Reynolds testified with respect to their report of April 15, 1970 wherein they gave it as their opinion that the defendant was able to understand the charges against him and was competent to stand trial. This report, however, further states: “In this case, however, there are certain fac *1088 tors in Ms illness that render his somewhat tenuous recovery subject to certain therapeutic supports. Without appropriate medication and in the presence of severe stress there is evidence that his illness mig’ht recur and again affect his ability to understand reality. The stress of the judicial process may upset the precarious balance between irrational appreciation of his present predicament and a delusional interpretation of due process of law.”
Their report also states that Mr. McCloud is “ consistently deviant with respect to his reasoning since he rationalizes his improvement on ongoing adversary proceedings involving peoples ’ attitudes towards him and his ability to continuously cope with adversity ’ ’.
Dr. Davis and Dr. Reynolds agreed that defendant’s illness was not difficult to bring under control as long as he was taking medication and undergoing psychotherapy, but that the illness was incurable. However, it was their opinion that under conditions of increased pressure, the defendant would be likely to relapse, and that even with medication, the defendant might and probably would decompensate under the stresses and pressure of the trial. Both doctors candidly admitted that they were unable to render an opinion whether, at the time of the competency hearing, less than one month after they had last seen him, the defendant was able to understand the charges or proceedings or able to aid in his defense. They testified it was quite possible for the defendant to have since relapsed and that they would not know, without further examination, whether or not the defendant was still logical, or if his thinking had again become disoriented and his reasoning impaired. They stated that, by their language in the report that recovery was 1 ‘ somewhat tenuous ”, was meant that the defendant would not remain improved over a period of time, particularly in periods of stress, and that the words 11 consistently deviant ’ ’ meant that the defendant is consistently mentally ill.
After his examination at the Rochester State Hospital and return to the jail, the defendant continued to receive the required amount of medication prescribed for him by Dr. Davis and Dr. Reynolds at the State hospital, 500 mg. of Thorazine and 15 mg. of Stellazine.
It was the opinion of Dr. Davis and Dr. Reynolds that because of the nature of the defendant’s illness, his mental competence would constantly fluctuate throughout the trial and, without continuously examining him during the court proceedings, one would not know the defendant’s mental competence to stand trial at any given time.
*1089 Dr. Libertson examined the defendant on May 5,1970, the day before the hearing, at the Monroe County Jail and made a preliminary diagnosis. Before making such diagnosis, he examined a copy of the Bochester State Hospital report, and also had an opportunity to review defense counsel’s notes of the testimony of Dr. Davis and Dr. Beynolds. He diagnosed the defendant at the time of the examination as being obviously delusional. Some of the defendant’s responses indicated that he was actively hallucinating. At one point he believed that Dr. Libertson was communicating with the guards downstairs. His thought processes were scattered, illogical, paranoid and seldom responsive to the crucial problems. It was Dr. Libertson’s opinion, both in his preliminary diagnosis and in his testimony, that the defendant is mentally ill; that in the face of the current medication which defendant was still receiving, he was nevertheless mentally ill and not controlled; that he was not then in a satisfactory state of remission and that he had a defective ability to understand reality.
It was Dr. Libertson’s further opinion that jail confinement and the impending judicial process had adversely affected the defendant; that he had a delusional interpretation of the law which made him unable to assist counsel in his defense and that defendant was not capable of understanding the nature of the proceedings or of understanding the charges against him, nor was he able to assist counsel in his defense and that, accordingly, defendant is not now competent to stand trial.
The defendant himself testified and gave a melancholy recital of the sordid conditions and depraved, brutalizing life he had experienced at Matteawan.
John Petrucelli, defendant’s counsel, also testified regarding the conditions he found at Matteawan when he made a visit there and stated he felt that they were worse than those at the Monroe County Penitentiary which the State Department of Correction had ordered discontinued more than a year ago as being unfit for further use or habitation. Petrucelli’s testimony seemed to make Matteawan fall within the definition given some prisons by former United States Attorney General Bamsey Clark as “warehouses of degraded humanity ”.
Along the same line, Dr. David Mactye, a psychiatrist and a full-time staff member and assistant professor of psychiatry at the University of Bochester, as well as Assistant Director of the Court Psychiatric Clinic, testified that he had visited Matteawan in 1965 in connection with his work in the Court Psychiatric Clinic to view its facilities as well as the work being done there. He spoke to people committed there as well as those *1090 awaiting trial and to members of the staff. In addition, he took an extensive tour of the buildings, including the open wards and the closely confined quarters where people awaiting trial were kept. Dr. Mactye described the conditions there as primitive, and the situation as not adequately structured for the people there. The occupational therapists informed him that they were understaffed and overworked, and the over-all picture was one of insufficient staff. Some of the inmates seemed to be poorly treated. What particularly struck the court was Dr. Mactye’s unequivocal opinion that Attica Prison can and does handle people better than those who are confined to Matteawan, regardless of whether such people are disturbed or not, because the inmates there get more attention and better treatment. He stated that every psychiatrist who has seen both facilities believes confinement 'in Attica Prison to be more beneficial for an individual than Matteawan.
Dr. Mactye also testified that there are facilities available at the Rochester State Hospital for an individual such as the defendant who is controllable by medication, who is awaiting trial, who is not violent and who has not been adjudicated criminally dangerous; further, that the defendant would be better off treated in a local facility and one with a more humane course of treatment, such as the Rochester State Hospital. He informed the court that, generally, patients sent to Matteawan from the Rochester State Hospital are sent only if they are ‘ ‘ severely and intractably violent
The court finds that the defendant is in such a state of idiocy, imbecility or insanity as to be incapable of understanding the charges against him or the proceedings or of making his defense. Accordingly, the trial or proceedings must be suspended pursuant to section 662-b.
The court finds that such transitory and fluctuating periods of remission which the defendant may have under medication do not constitute the competence which the law requires of anyone being made the subject of its process, and that the oscillating states of control described by Dr. Davis and Dr. Reynolds which appear to be temporary and subject to the continuous stresses and strains of the courtroom would be inadequate to assure the defendant the kind of trial which the law requires.
The court does not now touch upon the question of the adequacy or inadequacy of the medical, rehabilitative or remedial program at Matteawan State Hospital, except to state, in passing, that the Court of Appeals in Matter of Brabson v. Wilkins (19 N Y 2d 433) has indicated the propriety of judicial response to such a question if and when it properly arises. Unlike the *1091 situation in People ex rel. Baker v. Narcotic Comm., (58 Misc 2d 1069), where the court held that reasonable opportunity should be given to the Narcotic Addiction Control Commission to develop its relatively new rehabilitation program, Matteawan State Hospital has had well over 50 years to experiment and to work out custodial and rehabilitative procedures benefitting the benign and specialized purposes assigned to it by our Legislature so long ago. Some commentators are of the well-documented opinion that in every respect, except that of confinement, it has unfortunately and tragically failed. (Morris, The Confusion of Confinement Syndrome: An Analysis of the Confinement of Mentally Ill Criminals and Ex-Criminals by the Department of Correction of the State of New York, 17 Buffalo L. Rev. 651.)
However, the primary consideration is that, having been found incompetent to stand trial, the defendant will be incarcerated for months or years, perhaps for a lifetime. (E.g., Matter of Negro v. Dickens, 22 A D 2d 406.) He is subject to confinement for at least two years before he may even proceed against the indictment (Code Crim. Pro., § 662-b, subd. 3). The United States Supreme Court in Duncan v. Louisiana (391 U. S. 145) declared that a crime punishable by two years in prison, being a u serious crime ”, requires a trial by jury. Justice Dombotck L. Gtabbielli’s seminal opinion in Matter of Daniel D. (34 A D 2d 41) illuminates the need for a jury trial where extended commitment, whether civil or criminal, may be involved. (See, also, Matter of Hogan v. Rosenberg, 24 N Y 2d 207; People v. Sawyer, 33 A D 2d 242.) Thus, more is required and more should be required than a plenary hearing if a defendant is to be subjected to the repressive pattern of prison life and prison treatment, which is apparently all that Matteawan presently has to offer.
As one court has said, “ The insane are not, by their misfortune, stripped of constitutional rights.” (People v. Delfs, 31 Misc 2d 655, 658.)
Therefore, the court wishes to emphasize that the finding by it that the defendant is incompetent to stand trial is not equivalent to a finding that he is criminally insane or dangerously mentally ill in accordance with section 85 of the Mental Hygiene Law. The determination at this time of the defendant’s incompetence, ipso facto, an adjudication that he requires confinement in a maximum security institution like Matteawan. A finding of the need for such security must be based on additional considerations, such as the nature of the defendant’s illness and of his propensities which are reasonably and probably to be *1092 expected therefrom. As to such an adjudication, it would now seem to be settled that the defendant is entitled to a jury trial, if requested.
In People ex rel. Erwin v. Johnston (6 CrL 2309 [Sup. Ct., Dutchess County, Dec. 19, 1969]), relator, indicted for murder, first degree, was admitted to Matteawan State Hospital pursuant to section 662-b of the Code of Criminal Procedure after having been found to be in such mental state as to be incapable of understanding the charges against him. Citing United States ex rel. Schuster v. Herold (410 F. 2d 1071, cert. den. 396 U. S. 847); Baxstrom v. Herold (383 U. S. 107), and People v. Lally (19 N Y 2d 27), inter alia, the relator successfully argued that the statutory classification which limits a jury trial solely to patients confined in so-called civil mental hospitals denied him equality of protection. The court held that by providing jury trials for those sought to be retained in civil mental institutions the State could not, except for valid constitutional reasons, deny to the relator similar procedural safeguards in determining the legality of his continued retention at Matteawan, stating: “We conclude that under Baxstrom and Schuster, there is no valid constitutional predicate to deny to the relator, an inmate of an institution for the criminally insane under the aegis of the Department of Correction, the right to a jury trial now granted to a patient in a civil hospital under the Department of Mental Hygiene.”
People ex rel. Erwin v. Johnston (supra) was foreshadowed by People v. Fuller (24 N Y 2d 292). There, the Court of Appeals held that a jury trial was required on the issue of narcotics addiction, and that subdivision 2 of section 208 of the Mental Hygiene Law (providing for a hearing without a jury) violated the equal protection clause of the Fourteenth Amendment. Then Judge Keating, writing for the court, stated, (pp. 302-303):
“ All jails in some measure seek to have a program of rehabilitation, but in upholding, by way of dictum, a compulsory civil commitment program for narcotics rehabilitation, in Robinson v. California, (370 U. S. 660, 669), the Supreme Court was referring to a full and complete program of treatment. Compulsory commitment must indeed be something 1 beyond the hanging of a new sign — reading ‘ ‘ hospital ’ ’ — over one wing of the jail house. ’ (Powell v. Texas, 392 U. S. 514, 529).
“ If compulsory commitment turns out in fact to be a veneer for an extended jail term and is not a fully developed, comprehensive and effective scheme, it will have lost its claim to be a project devoted solely to curative ends. It will then take on the *1093 characteristics of normal jail sentence, with a side order of special help. The moment that the program begins to serve the traditional purposes of criminal punishment, such as deterrence, preventive detention, or retribution, then the extended denial of liberty is simply no different from a prison sentence. (United States ex rel. Gerchman v. Maroney, 335 F. 2d, 309-310 [3d Cir.]) and the constitutional guarantees applicable to criminal proceedings will apply in full measure.”
Several years earlier, in People v. Lally (19 N Y 2d 27, supra), the Court of Appeals held that a person acquitted of a crime by reason of insanity and committed pursuant to section 454 of the Code of Criminal Procedure is entitled to a jury trial on the issue of whether his own protection or that of society requires his continued detention. The language of then Chief Judge Desmond is particularly appliable here. (Id., p. 35): “To comply with the spirit if not the express language of the Baxstrom decision (supra) we hold that, before there can be any commitment to Matteawan State Hospital for the insane under section 454 procedures, a person must be accorded all the protections of sections 74 and 85 of the Mental Hygiene Law, including a jury trial, if requested. ’ ’
Section 454 of the code has to do with the commitment of a defendant acquitted on the ground of insanity. Except for the fact that it deals with disposition after trial, section 454 is similar in application to section 662-b, which deals with pretrial disposition. Both require commitment of a defendant “ to the custody of the commissioner of mental hygiene to be placed in an appropriate institution in the state department of mental hygiene or the state department of correction which has been approved by the heads of such departments ”.
“ Thus,” as Judge Keating observed in People v. Fuller, (supra, at p. 305), “ the fact that there is or is not an underlying conviction is wholly immaterial to the issue to be decided ”.
Although there may be some question as to whether the statute specifically authorizes the court to place limits upon the defendant’s commitment, its inherent power to do so is clearly indicated in People ex rel. Brown v. Johnston, (9 N Y 2d 482, 485), where Judge Burke effectively pointed out:
“The State’s right to detain a prisoner is entitled to no greater application than its correlative duty to protect him from unlawful and onerous treatment (Ann. 155 A. L. R. 145, 146), mental or physical * * *
“ To implement this duty and secure the relief due the prisoner, we can and should recognize that, 1 [C]ourts have always *1094 asserted and exercised authority which,, though perhaps not expressly established by statute, is ‘1 based upon the inherent right and duty of the courts to protect the citizen in his constitutional prerogatives and to prevent oppression or persecution.” ’ (People v. Gersewitz, 294 N. Y. 163, 167; People ex rel. Saia v. Martin, 289 N. Y. 471.)” (See, also, People v. Sawyer, 33 A D 2d 242, 245, supra.)
It is for this very reason that habeas corpus is available to test the validity of a commitment in an institution for the criminally insane without the necessity of first having a certification that the petitioner is sane as a condition to such a hearing. (People ex rel. Ciavarelli v. Herold, 32 A D 2d 692, citing People ex rel. Brown v. Johnston (supra); cf. Hoff v. State of New York, 279 N. Y. 490, as to a jury trial in that proceeding.)
It would appear, however, that section 662-b intended to and did draw a real distinction between an institution in the Department of Mental Hygiene, e.g., Rochester State Hospital, and an institution in the Department of Correction, e.g., Matteawan, by separating the two in paragraphs (a) and (b) of subdivision 3, as follows :
“ In the event of the dismissal of the indictment or proceedings as herein provided, and if the defendant shall be confined to an institution in the department of mental hygiene and shall continue to be so mentally ill or mentally defective as to require continued treatment and confinement in cm institution (§ 662-b, subd..3, par. [a], emphasis supplied.)
“ In the event of the dismissal of the indictments or proceedings as herein provided and if the defendant shall be confined to an institution in the department of correction and shall continue to be so dangerously mentally ill or dangerously mentally defective as to require continued treatment and confinement in an institution in the department of correction ”. (§ 662-b, subd. 3, par. [b], emphasis supplied.)
Further, the court appears to have the power directly from section 662-b (subd. 1) which would seem to give the court discretion ‘ ‘ to commit the defendant to the custody of the commissioner of mental hygiene to be placed in an appropriate institution in the state department of mental hygiene or the state department of correction which has been approved by the heads of such departments.” (Emphasis supplied.) The language allows for an alternative disposition. Such disposition is no less a responsibility of the court than is its initial determination, medical as well as legal, of a defendant’s mental competence to stand trial.
*1095 In addition, section 662-f provides that the jurisdiction of the court to enforce its own orders shall not be impaired by the sections preceding it.
Accordingly, the defendant is to be committed, pursuant to section 662-b of the Code of Criminal Procedure, but to a civil institution only.