\Arnold L. Fein, J.
Anonymous is involuntarily committed to Manhattan State Hospital (Manhattan State), a hospital under the jurisdiction of the Department of Mental Hygiene, as a civil patient, on a “ two physician certificate ”, as mentally ill and suitable for care and treatment under section 72 of the Mental Hygiene Law.
As defined in subdivision 8 of section 2 of the Mental Hygiene Law “‘A mentally ill person ’ means any person afflicted with mehtal disease to such an extent that for his own welfare or the welfare of others, or of the community, he requires care and treatment ”.
Manhattan State now applies for an order pursuant to section 85 of the Mental Hygiene Law, committing Anonymous to Matteawan State Hospital (Matteawan), a hospital under the jurisdiction of the Department of Correction, upon the ground that he is “ dangerously mentally ill ”.
Subdivision 1 of section 85 requires the court to determine, after a hearing, whether the patient is “so dangerously mentally ill that his presence in such a hospital [State hospital under the jurisdiction of the Department of Mental Hygiene] is dangerous to the safety of other patients therein, the officers or employees thereof, or to the community ”. “ If it be determined that such person is dangerously mentally ill, the judge shall *182 forthwith issue his order hospitalizing him in the Matteawan state hospital ” (subd. 4; emphasis supplied).
Anonymous, represented by the Mental Health Information Service (§ 88), and its counsel, objects to being transferred to Matteawan, upon the grounds that: (1) he is not “ dangerously mentally ill ”, and, (2) even if he is found to be “ dangerously mentally ill ”, his transfer would violate the equal protection and due process clauses of the Federal and State Constitutions.
At the hearing it was established beyond a reasonable doubt that, due to his mental illness, Anonymous committed several assaults and assaultive acts while in Manhattan State, including a very serious assault upon an attendant, thus endangering the safety of other patients and employees of the hospital. Accordingly, it is found that Anonymous is ‘1 dangerously mentally ill ” within the meaning of the statute.
The issue remains whether Anonymous is denied the equal protection of the law and due process because the statute directs that, upon finding that he is “ dangerously mentally ill”, the Judge “ shall” issue an order “ hospitalizing ” the patient in Matteawan.
. The effect of section 85 is to separate civil mentally ill persons into two-categories. Those who are 1 ‘ dangerously mentally ill ’ ’ are required to be transferred to Matteawan, under the jurisdiction of the Department of Correction. Those who are not, although they may be “ dangerous ” in another sense (§ 76), are to be retained in civil mental hospitals, under the jurisdiction of the Department of Mental Hygiene.
That there is a real distinction between the two classes of patients is manifest. That such differences may not only warrant but may even require variations in types and kinds of security, custody, care and treatment is patent. Respondent so concedes.
It is appropriate for the Legislature to recognize and valid for it to legislate on the basis of such a distinction. However, such legislation must bear a reasonable and just relationship to the purpose sought to be achieved. (Sherbert v. Verner, 374 U. S. 398; Gulf, Colorado & Santa Fé Ry. Co. v. Ellis, 165 U. S. 150.) The rights of the individual are unconstitutionally and unlawfully infringed and he is denied the equal protection of the law if the legislative classification requires that he and his class be treated differently from others on a basis not clearly and necessarily related to the constitutional State objective and interest to be served. (Baxstrom v. Herold, 383 U. S. 107; Shelton v. Tucker, 364 U. S. 479.)
*183 The purpose of a transfer to Matteawan under section 85 is to place ‘ ‘ dangerously mentally ill ’ ’ patients under conditions of maximum security so as to protect other patients, hospital personnel and the community. This gives primacy to the problems of security and custody and little or no recognition to the need of the patient for care and treatment.
Anonymous has not been charged with the commission of any crime, nor has he been involved in the criminal process, in any way. As characterized by his counsel, his only so-called “ crime ” is being mentally ill, or as here found, “ dangerously mentally ill.” That a person is “ dangerously mentally ill ” is neither a crime nor a basis for the denial of constitutional rights. Anonymous is confined, not as a convicted criminal, not as a person charged with a crime or as one who has had any involvement with the criminal process, but rather as a mentally ill civil patient in a civil hospital who requires custody, “ care and treatment ” under the jurisdiction of the Department of Mental Hygiene. Transfer to Matteawan would change not only the place, but also the nature, of his confinement. Although the Department of Mental Hygiene has the right to visit and inspect its facilities (Mental Hygiene Law, § 7), Matteawan is under the jurisdiction of the Department of Correction (Correction Law, § 400, subds. 1, 4).
A comparison of the duties of these departments is revealing. ‘ ‘ The department of mental hygiene is charged with the execution of the laws relating to the custody, care and treatment of the mentally ill ”. (Mental Hygiene Law, § 7, subd. 1; emphasis supplied.) The Department of Correction is primarily charged with the responsibility of maintaining prisons.
In addition, pursuant to subdivision 1 of section 400 of the Correction Law: “ The department of correction shall maintain one or more hospitals, to be used solely for the purpose of holding in custody and caring for such mentally ill persons held under any other than a civil process as may be committed to the department by courts of criminal jurisdiction, or placed therein or transferred thereto by the commissioner of mental hygiene, and for such persons as may be committed thereto pursuant to the provisions of section eighty-five of the mental hygiene law, and for such convicted persons as may be declared mentally ill while undergoing sentence of imprisonment, or upon commitment as youthful offenders, juvenile delinquents or wayward minors at any of the various penal institutions of the state, and for all female convicts becoming mentally ill while undergoing sentence ” (emphasis supplied).
*184 It is significant that the Mental Hygiene Law charges the Department of Mental Hygiene with “ treatment ” of its patients, thus recognizing a right to treatment. (See §§ 71, 72, 75, 76, 78.) No such duty is imposed on the Department of Correction by the Correction Law or the Mental Hygiene Law. Its hospitals are “ solely for the purpose of holding in custody and caring for such mentally ill persons ” (Correction Law, § 400, subd. 1; cf. Mental Hygiene Law, §§ 11, 11-a, practically excluding the Department of Mental Hygiene from services, duties and responsibilities respecting Matteawan).
It cannot be disputed that involuntary incarceration in civil hospitals of mentally ill persons for treatment may legitimately and constitutionally be authorized by the Legislature. It is quite another matter to direct that a mentally ill person, in custody involuntarily, be held, not in a civil hospital, but in an institution operated by the Department of Correction, the legal responsibilities of which are primarily the custody and care of criminals and those involved in the criminal process and with no legislative mandate for treatment of the mentally ill.
There are other differences, indicative of a prison setting. Greater restrictions are placed on persons held at Matteawan, including: (1) those relating to correspondence between inmates and relatives, friends, public officials and the Mental Health Information Service (cf. Correction Law, § 413 and Mental Hygiene Law, § 15, and 14 NYCRR [Mental Hygiene] 21.1, 21.2, and 21.4); and (2) those concerned with visitation by relatives and friends and access to the Mental Health Information Service, (cf. Correction Law, § 413 and 14 NYCRR [Mental Hygiene] Part 57).
The distinction between Matteawan and State civil mental hospitals has been recognized in a long line of New York and Federal cases and in studies by individuals and committees, whose work and conclusions have been acknowledged by the courts. (United States ex rel. Carroll v. McNeill, 294 F. 2d 117 [2d Cir., 1961]; Baxstrom v. Herold, 383 U. S. 107; cf. People ex rel. Brown v. Johnston, 9 N Y 2d 482; People v. McCloud, 62 Misc 2d 1086; Whitree v. State of New York, 56 Misc 2d 693; United States ex rel. Hill v. Johnston, 321 F. Supp. 818; Report of Special Comm, on Commitment Procedures and the Law Relating to Incompetents, Assn. of Bar of City of N. Y., Mental Hlness, Due Process and the Criminal Defendant [Fordham Univ. Press, 1968]; see, also, Morris, ‘1 The Confusion of Confinement Syndrome: An Analysis of the Confinement of Mentally 111 Criminals and Ex-Criminals by the Department of Corree *185 tion of the State of New York,” 17 Buffalo L. Bev. [1968] 651; Morris, ‘ ‘ The Confusion of Confinement Syndrome Extended: The Treatment of Mentally 111 ‘ Non-Criminal Criminals ’ in New York,” 18 Buffalo L. Bev. [1969] 393.) Although these cases and materials primarily deal with questions concerning mentally ill persons who are involved in the criminal law system because they have either been convicted of or charged with crime, the pertinent point they make is that confinement in Matteawan is confinement in a maximum security prison setting, far more restrictive and far less likely to afford treatment than a civil State hospital. Although treatment may be available and may perhaps be provided, it is not mandated. As stated by Justice Markowitz in Neely v. Hogan (62 Misc 2d 1056, 1060-1061):
“ There are vast differences between confinement in Matteawan, which is operated by the Department of Correction, and confinement in a civil hospital operated by the Department of Mental Hygiene. * * *
“ The court takes judicial notice of the fact that, in the wake of the United States Supreme Court’s decision in Baxstrom v. Herold (383 U. S. 107) there has been a significant decline in the patient population at Matteawan and a corresponding improvement in the therapeutic opportunities available to the hospital’s remaining patients. The distinction between Matteawan and civil hospitals operated by the Department of Mental Hygiene nonetheless remains.”
Matteawan is primarily a correctional mental facility for persons involved in the criminal process. The Attorney-General’s brief on behalf of Manhattan State shows that, of the 602 persons in Matteawan on June 2,1971, 71 were committed pursuant to section 85 of the Mental Hygiene Law; 36 were committed as mentally ill while serving sentences as convicted criminals pursuant to section 408 of the Correction Law; and 492 were committed as indicted persons incompetent to stand trial and assigned to Matteawan by the Commissioner of Mental Hygiene (Code Grim. Pro., § 662-b). It is noteworthy that since September 1, 1971, section 662-b of the Code of Criminal Procedure has been superseded by article 730 of the CPL, which does not permit commitment to Matteawan of those accused of crinle, except for those found to be “ dangerous incapacitated” persons. Even as to such persons the statute does not mandate commitment to Matteawan, although such persons partake of the same characteristics as those found to be “ dangerously men *186 tally ill ” under section 85 of the Mental Hygiene Law (GPL 730.50, subd. 1; 730.60, subd. 3).
The distinction between Matteawan, a correctional mental facility, and a civil hospital under the jurisdiction of the Department of Mental Hygiene, is such as to compel the conclusion that the statutory mandate requiring the Judge to order the transfer of a dangerously mentally ill civil patient to Matteawan violates the equal protection clauses of the Federal and State Constitutions. There is no reasonable and just relationship between the proper purpose sought and the transfer mandated. Transfer to Matteawan is not clearly and necessarily related to the need for greater security and the protection of other patients and employees of Manhattan State and the community. It is unreasonable and unjust to place a mentally ill person in the custody and care of the Department of Correction because he is required to be kept under greater security and custody than other mentally ill patients.
For substantially the same reasons, although the hearing procedures meet the standards of procedural due process, the statutory mandate to the Judge denies respondent substantive due process (United States ex rel. Daniels v. Johnston, 328 F. Supp. 100).
It is not an answer to say that Anonymous will not be kept in a prison context, if transferred to Matteawan, because the sign on the institution describes it as a “ State Hospital.” Nor is it an answer to respond that other facilities are not available. Although it has failed to make such showing, the Department of Mental Hygiene may be unable to fulfill its obligation of appropriate security, custody, care and treatment, without affirmative action by the legislative or executive branch to appropriate or reallocate funds for such purposes. “But that is no reason for the court to refrain from declaring that the obligation exists even though persons beyond the reach of the court prevent its discharge ” (Doe v. General Hosp. of Dist. of Columbia, 434 F. 2d 427, 433; quoted with approval in Williams v. Robinson, 432 F. 2d 637, 641, n. 9).
The requirement that respondent be transferred to Matteawan does not have even a minimal rational basis. It is violative of the State and Federal Constitutions.
This should be dispositive. However, upon argument and in their briefs and in material submitted to the court substantially thereafter, it was suggested that the constitutionality of the statute might be saved if the petitioner could demonstrate that there is no less restrictive alternative available. Although much *187 of the argument misconceives the impact of cases applying the doctrine of less restrictive alternatives, the concept is worthy of exploration. It may reveal a constitutionally permissible means for insuring the necessary greater security and custody, coupled with the requisite care and treatment for respondent, with due regard to the safety of other patients, hospital employees and the community.
Most of the cases referred to by the parties involved holdings that the legislation or administrative regulations or action were unconstitutional upon the ground that the sanctions or procedures imposed or mandated were overbroad and hence did not comport with the equal protection of the laws or denied due process. (Shelton v. Tucker, 364 U. S. 479; Sherbert v. Verner, 374 U. S. 398; Aptheker v. Secretary of State, 378 U. S. 500; Zemel v. Rusk, 381 U. S. 1; Carrington v. Rash, 380 U. S. 89.) Unlike the suggestion here, the courts, in these cases, were not called upon to find or propose less restrictive alternatives. The courts merely indicated that less restrictive alternatives might be found constitutional. However, two of the cases provide some guidance.
In Lake v. Cameron (364 F. 2d 657), the Court of Appeals considered the District of Columbia statute (D. C. Code, § 21-545, subd. [b]) relating to civil commitment, which reads,1 ‘ the court may order his hospitalization for an indeterminate period, or order any other alternative course of treatment which the court believes will be in the best interests of the person or of the public.” The court held, in the light of the statute (p. 660): “ The court’s duty to explore alternatives in such a case as this is related also to the obligation of the state to bear the burden of exploration of possible alternatives an indigent cannot bear.”
In Covington v. Harris (419 F. 2d 617, 623), dealing with the same statute, the court stated: 1‘ legislation apart, however, the principle of the least restrictive alternative consistent with the legitimate purposes of a commitment inheres in the very nature of civil commitment, which entails an extraordinary deprivation of liberty justifiable only when the respondent is 1 mentally ill * * * ’ A statute sanctioning such a drastic curtailment of the rights of citizens must be narrowly, even grudgingly, construed in order to avoid deprivations of liberty without due process of law”.
The difficulty of applying this principle to the.case at bar is the fact that these cases dealt with a District of Columbia statute, the language of which was amenable to a construction that the administrators or the court could invoke the doctrine that “ the *188 principle of the least restrictive alternative is equally applicable to alternate dispositions within a mental hospital.” (p. 623). The opinion of Judge Sokeloff in Tippett v. State of Maryland (436 F. 2d 1153, 1160, n. 3) dealing with the psychiatric hospitalization of sentence-serving prisoners is instructive in this context.
However, our statute provides no alternatives. Whether the court may read into the statute a less restrictive alternative and make an order based thereon, in order to save the statute’s constitutionality is not free from doubt. (See Matter of Buttonow, 23 N Y 2d 385; People v. Lally, 19 N Y 2d 27 and Neely v. Hogan, 62 Misc 2d 1056, supra, and cases there cited.) To read alternatives into this statute is to nullify it.
However, the procedures adopted by the Department of Mental Hygiene in the light of United States ex rel. Daniels v. Johnston ( 328 F. Supp. 100) and article 730 of the GPL may point the way. Pursuant thereto, persons held in Matteawan under section 662-b of the Code of Criminal Procedure, now superseded by article 730 of the CPL, are to be transferred to civil State hospitals, except for those found to be dangerously incapacitated. As a consequence, the department has established a new independent maximum security hospital on the grounds of Matteawan, operated by the Department of Mental Hygiene. This new facility, the Mid-Hudson Center, is, in the Department’s words, “to be used as a diagnostic, intensive treatment and referral center [wherein] after thorough evaluation * * * a patient will be either treated in the unit * * * or arrangements will be made for suitable treatment elsewhere.” (Mental Hygiene News, N. Y. State Dept, of Mental Hygiene, Vol. 42, No. 19, Oct. 15,1971; letter and attached memo., Dept, of Mental Hygiene, Oct. 19,1971, John B. Wright, Asst. Commr. to MHIS, 3d Jud. Dept.). Such a maximum security civil State hospital would appear to be appropriate for patients such as Anonymous, even though the statute does not authorize the Judge to direct transfer thereto. The court has also now been advised that there are “intensive care units ” available at Bronx State Hospital (Bronx State Hospital, Lincoln Intensive Care Unit, memo. Stephen Rachlin, M.D.) and at Central Islip Hospital. The existence of these three institutions suggests that the problem may be resolved by administrative action. The very fact that such facilities exist demonstrates that the statutory requirement mandating transfer to Matteawan denies Anonymous and others similarly situated the equal protection of the laws and substantive due process.
*189 No legitimate legislative end can be served by incarcerating Anonymous, a mentally ill person now found to be dangerous, together with and in a place for convicted criminals and others involved in the criminal process, while facilities such as these are available. Transfer and commitment to Matteawan would unnecessarily impose even greater restrictions on his liberty and surroundings than could reasonably be necessary to the legislative end sought — ■ treatment in appropriate surroundings necessary for his welfare or the welfare of others, or of the community (Mental Hygiene Law, § 2, subd. 8). The application to commit Anonymous to Matteawan is denied.
Accordingly, the court has signed the order submitted by the petitioner, which incorporates its findings that Anonymous is dangerously mentally ill, but has stricken therefrom the direction that he be committed to Matteawan.
As has been here found, the direction in the statute requiring transfer of Anonymous to Matteawan is unconstitutional. Accordingly, a direction for such transfer cannot lawfully be incorporated in the court’s order. Anonymous is not to be transferred to Matteawan. He is to be retained in a civil hospital.
If it is desired that there be a court direction authorizing his transfer to one of the three facilities of the Department of Mental Hygiene here mentioned, or any other facility within the Department of Mental Hygiene which will provide the requisite security together with appropriate care and treatment, the court will entertain such an order, although it is believed that the matter may be handled administratively without the need for court order.