Luis GOMEZ et al., Plaintiffs,

v.

Alan D. MILLER, Commissioner of Mental Hygiene of the State of New York, et al., Defendants.

No. 71 Civ. 2411.

United States District Court,
S. D. New York.

April 14, 1972.

See also D.C., 337 F.Supp. 386.

Kristin Booth Glen, Bill of Rights Foundation, New York City, for plaintiffs; Nancy Stearns, National Lawyers Guild, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., State of New York, New York City, for defendants; Samuel A. Hirshowitz, Brenda Soloff, New York City, of counsel.

Bruce J. Ennis, New York City, for The American Civil Liberties Union and New York Civil Liberties Union, amici curiae.

Before MOORE, Circuit Judge, and MacMAHON and LASKER, District Judges.

LASKER, District Judge.

This civil rights class action raises important questions as to the constitutionality of the New York statutes under which persons indicted for felony may be held untried in New York State's Matteawan and Dannemora Hospitals—generally known as hospitals for the "criminally insane."

### I.

All the plaintiffs have been indicted for felony but none has been tried or convicted. Each has been committed to Matteawan on a certification of incompetency to stand trial. Gomez and DeMundo were sent to Matteawan in 1970 and 1971, respectively. Metesky has been in custody there since 1957 and Ingram since 1966.[1] They bring this action under 42 U.S.C. § 1983 for a declaration of the unconstitutionality of § 662–b of the New York Code of Criminal Procedure (CCP) and certain portions of its successor, Article 730 of the New York Criminal Procedure Law (CPL), McKinney's Consol. Laws, c. 11–A, and for injunctive relief. Jurisdiction is predicated on 28 U.S.C. §§ 1343(3), 2201 and 2202, the Fourth Amendment to, and Article 4, § 1, Clause 1, of the United States Constitution. Their major contention is that the procedure (of both statutes) violates the equal protection and due process clauses of the Fourteenth Amendment because it does not afford them a jury trial as to dangerousness as a prerequisite to commitment. They also attack the provisions of both statutes which (1) permit nonresidents of the state to move to dismiss the underlying indictment ten days after a finding of incompetency upon a showing that such nonresident will be removed to the state of his residence, while allowing New York residents such a right only after two years of continuous confinement, and (2) require permission of the district attorney to move for dismissal of the indictment.

---

1. After the institution of this suit, on December 21, 1971 Ingram was discharged from Matteawan and returned to New York County as recovered. He was originally committed to Matteawan in October 1966, released in February 1968 after certification as recovered, and recommitted with consent in April 1969. As of the commencement of this suit, persons indicted but untried, in custody at Matteawan, had been there for the following periods: 219 for a year or less; 74 more for up to two years; an additional 34 for up to three years; 31 more for up to four years; 12 more for up to five years; 67 more (of whom 39 were charged with homicide) for between six and ten years.

New York operates two classes of hospitals for the mentally ill, one controlled by the Department of Mental Hygiene, the other by the Department of Correction. Matteawan and Dannemora fall in the latter group. The differences between the two classes are real, and have been noted by the courts. In United States ex rel. von Wolfersdorf v. Johnston, 317 F.Supp. 66 (S.D.N.Y.1970), in which plaintiff sought transfer from Matteawan to a civil hospital, Judge Frankel stated (citing Neely v. Hogan, 62 Misc.2d 1056, 310 N.Y.S.2d 63, 67–68 (Sup.Ct.N.Y.Co.1970)): "There is no question that the place where this relator is now held . . . is vastly different from—i. e., more miserable than —state hospitals for those civilly committed." And the Court of Appeals of this Circuit referred to "the adversities and rigors" of Dannemora in United States ex rel. Schuster v. Herold, 410 F. 2d 1071, 1078–1079 (2d Cir. 1969), cert. den. 396 U.S. 847, 90 S.Ct. 81, 24 L.Ed. 2d 96 (1969).

As recently as February 24, 1972, in In the Matter of the Application for the Commitment of Anonymous, an Alleged Dangerously Mentally Ill Patient, to Matteawan State Hospital, 329 N.Y.S. 2d 542, the Supreme Court of New York County emphasized the distinction between Matteawan and civil hospitals operated by the Department of Mental Hygiene as follows:

"It is significant that the Mental Hygiene Law charges the Department of Mental Hygiene with 'treatment' of its patients, thus recognizing a right to treatment. (See MHL Secs. 71, 72, 75, 76, 78). No such duty is imposed on the Department of Correction by the Correction Law or the Mental Hygiene Law. Its hospitals are 'solely for the purpose of holding in custody and caring for such mentally ill persons * * *' (Correction L. Sec. 400(1); * * *.)

\* \* \* \* \* \*

"There are other differences, indicative of a prison setting. Greater restrictions are placed on persons held at Matteawan, including: (1) those relating to correspondence between inmates and relatives, friends, public officials and the Mental Health Information Service (Cf. Correction L. Sec. 413 and MHL Sec. 15 and 14 N.Y.C.R. R., Mental Hygiene, 21.1, 21.2 and 21.-4); (2) those concerned with visitation by relatives and friends and access to the Mental Health Information Service (MHIS), (Cf. Correction L. Sec. 413 and 14 N.Y.C.R.R., Mental Hygiene, part 57)."[2]

2. The court decisions and literature on the distinction between Matteawan and the civil hospitals are copious. It was last set forth in "Anonymous," (supra) 329 N.Y.S.2d 542 at pp. 546 and 547, as follows:
"The distinction between Matteawan and state civil mental hospitals has been recognized in a long line of New York and federal cases and in studies by individuals and committees, whose work and conclusions have been acknowledged by the courts. U. S. ex rel. Carroll v. McNeill, 294 F.2d 117 (2d Cir. 1961); Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620; Cf. People ex rel. Brown v. Johnston, 9 N.Y.2d 482, 215 N.Y.S.2d 44, 174 N.E. 2d 725; People v. McCloud, 62 Misc. 2d 1086, 310 N.Y.S.2d 772; Whitree v. State, 56 Misc.2d 693, 290 N.Y.S.2d 486; U. S. ex rel. Hill v. Johnston, D.C., 321 F.Supp. 818; Rept.Spec. Comm. on Commitment Procedures and the Law Relating to Incompetents, Ass'n of the Bar of the City of N.Y., Mental Illness, Due Process and the Criminal Defendant, (Fordham Univ. Press, 1968); see also Morris, 'The Confusion of Confinement Syndrome: An Analysis of the Confinement of Mentally Ill Criminals and Ex-Criminals by the Department of Correction of the State of New York,' 17 Buffalo L.Rev. (1968) 6512; Morris, 'The Confusion of Confinement Syndrome Extended: The Treatment of Mentally Ill "Non-Criminal Criminals" in New York,' 18 Buffalo L.Rev. (1969) 393). Although these cases and materials primarily deal with questions concerning mentally ill persons who are involved in the criminal law system because they have either been convicted of or charged with crime, the pertinent point they

Plaintiffs claim that a person indicted, but untried, may not constitutionally be committed to the "rigors" of a hospital run by the Department of Correction except upon a jury determination that he is dangerous. They do not dispute that members of their class, if found incompetent, may be committed to a civil hospital without such a finding. If granted the relief they seek, plaintiffs would continue at Matteawan if found dangerous by a jury, but otherwise would be transferred to a civil hospital. Unless found competent to stand trial, none would be released.

## II.

### The Statutory Scheme

The (new) CPL has become effective since the commencement of this suit. The CPL did not in haec verba repeal the CCP or other statutes governing the commitment of mentally ill persons. It does provide at § 1.10 that "[t]he provisions of this chapter apply to (a) all criminal actions and proceedings commenced prior to the effective date thereof but still pending on such date . .," and the Attorney General of New York has construed the new law to apply to plaintiffs' cases on the ground that their indictments were still pending on the effective date of the statute.[3] Nevertheless, the question whether the old law still governs is not free from doubt, and accordingly we must examine both statutory schemes.

### A. Commitment Provisions

With one minor exception, under the old statutory arrangement no person other than members of the plaintiffs' class may be committed to Matteawan unless found to be dangerously mentally ill and accorded various safeguards, including a de novo jury trial as to dangerousness. The classes thus protected are:

Persons not charged with crime (§ 85 Mental Hygiene Law, McKinney's Consol. Laws, c. 27);

Persons charged with crime but not indicted (§ 872 Code Cr.Proc.);

Persons acquitted on the ground of mental disease or defect (§ 454 Code Cr. Proc., as interpreted by the New York Court of Appeals in People v. Lally, 19 N.Y.2d 27, 277 N.Y.S.2d 654, 224 N.E. 2d 87 (1966)).

The exception applies to convicted prisoners serving their terms for whom the applicable statute provides a de novo jury trial merely as to competence, but not as to dangerousness.

In the case of the plaintiffs' class, the governing statute, § 662–b Code Cr.Proc., makes no provision for a determination as to dangerousness, by jury or otherwise, or for the rights accorded convicted prisoners,[4] such as jury trial as to

---

make is that confinement in Matteawan is confinement in a maximum security prison setting, far more restrictive and far less likely to afford treatment than a civil state hospital. Although treatment may be available and may perhaps be provided, it is not mandated. As stated by Justice Markowitz in Neely v. Hogan, 62 Misc.2d 1056, at p. 1060, 310 N.Y.S.2d 63, at pp. 67, 68: 'There are vast differences between confinement in Matteawan, which is operated by the Department of Correction, and confinement in a civil hospital operated by the Department of Mental Hygiene. * * * 'The Court takes judicial notice of the fact that, in the wake of the United States Supreme Court's decision in Baxstrom v. Herold (383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966)), there has been a significant decline in the patient population at Matteawan and a corresponding improvement in the therapeutic opportunities available to the hospital's remaining patients. The distinction between Matteawan and civil hospitals operated by the Department of Mental Hygiene nonetheless remains.' "

3. The original complaint, filed before the effective date of the CPL, attacked only the provisions of the CCP. After the CCL came into force plaintiffs moved to amend the complaint requesting relief as to the new statute. The motion was granted and the complaint amended accordingly.

4. As the opinion of the convening judge indicated, the explanation for the fact that the rights of untried defendants are

competence, notice to relatives, or periodic review of mental condition.

Under the new CPL, which in various sections incorporates § 85 of the Mental Hygiene Law by reference, a jury trial as to dangerousness is required as a condition to commitment to Matteawan in the following cases:

Persons convicted of a crime whose sentences are about to expire (CPL § 730.70(2));

Persons acquitted by reason of mental disease or defect (CPL § 330.20(6));

Persons charged with misdemeanors but not yet tried (CPL §§ 730.50(1) and 730.60(3)).

Persons not charged with crime continue to be entitled to a jury trial as to dangerousness under the provisions of § 85 of the Mental Hygiene Law.

The CPL (§ 730.60(1)) does require an adjudication of dangerousness for persons of the plaintiff class (indicted for felony but not yet tried) prior to commitment to Matteawan, but, distinct from the cases of those classes specified above, it does not afford plaintiff class the right to a jury trial finding of dangerousness.

One other distinction may exist between the procedural rights of the plaintiff class and other persons committed to Matteawan. CPL §§ 730.50(2) and 730.60(4) appear to require that persons already in custody of the Commissioner of Mental Hygiene but not yet adjudicated dangerous (plaintiff class) must affirmatively request a hearing as to dangerousness, while other persons receive such hearings without request.

### B. Special Treatment of Nonresidents

Both the old and new statutes provide (1) that nonresident prisoners may move for dismissal of the underlying indictment against them ten days after a finding of incompetence, but resident prisoners may move only after two years of continuous confinement. (Code Cr.Proc. § 662–b(3); CPL § 730.60(6)).

### C. Requirement of District Attorney's Consent

Under the CCP, criminal proceedings were suspended as to an incompetent defendant during the period of his incompetency, and such a defendant could not move to attack the validity of the indictment pending against him. Under the CPL, § 730.60(5), the bar has been eliminated. It is not clear from the face of the new statute whether it applies to the plaintiff class. Plaintiffs argue that if the old law is still applicable, its terms deny them due process of law by barring their right of access to the courts.

### III.

The plaintiffs contend that the statutory procedures under which they have been committed to and are retained at Matteawan violate their rights to equal protection under the Fourteenth Amendment; that they are entitled to a jury trial on the issue of dangerousness as a matter of due process; that both statutes discriminate between residents and nonresidents in violation of the equal protection clause of the Fourteenth Amendment and the privileges and immunities clause of Article 4; that if the new statute applies to them, it violates both due process and equal protection by requiring of them an affirmative demand for a hearing on dangerousness; and finally, that the requirement of the District Attorney's consent as a condition to the making of a motion violates the rights to equal protection and due process.

The defendants contest the jurisdiction of the court, asserting that the case is properly classified as a petition for habeas corpus which bars federal relief because state remedies have not been exhausted; that, in any event, the court

---

narrower than those of convicted defendants is that after the holding in United States ex rel. Schuster v. Herold, supra, 410 F.2d 1071, that convicted prisoners serving a sentence could not be committed to Matteawan without substantially the same protection accorded a nonprisoner, the New York legislature amended § 408 of the Correction Law, McKinney's Consol. Laws, c. 43, to broaden the rights of convicts but did not expand the rights of persons indicted but untried.

should abstain from exercising jurisdiction to permit the state courts to construe the new statute so that constitutional questions may be avoided; that the statutes do not violate the equal protection, due process, or privileges and immunities clauses, and that no class action order should be entered.

For the reasons set forth below, we hold that the court has jurisdiction to decide the case and that the failure of either statutory scheme to provide plaintiffs with a jury trial as to the determination of dangerousness violates their rights to equal protection.

As to the remaining questions presented, we find that the state courts may construe the challenged provisions so as to avoid constitutional questions. Accordingly, we abstain from decision as to those matters, but retain jurisdiction pending the disposition of such claims in the New York courts.

## IV.

### A. *Jurisdiction*

■ The defendants argue that the court is without jurisdiction because the relief sought is that of habeas corpus and plaintiffs have not exhausted state remedies as required by 28 U.S.C. § 2254 (b). The contention is without merit. Whatever doubts may have existed before Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971, per curiam), have been settled by the decision in that case. There prisoner-plaintiffs challenged living conditions and disciplinary measures in a state penitentiary. They did not seek release. After unsuccessful proceedings in the state courts, they sought habeas corpus in the federal courts. The District Court dismissed the applications and the Court of Appeals affirmed, holding that, although petitioners had exhausted state habeas relief, the requirements of 28 U.S.C. § 2254 had not been satisfied because petitioners had not invoked possible alternatives to state habeas, such as injunctive relief, a writ of prohibition, mandamus, or a declaratory judgment.

Reversing these determinations, the Supreme Court held that, whether or not petitioners had exhausted state remedies, they were entitled to proceed under the Civil Rights Act. The Court stated in plain language:

> "The remedy provided by these Acts 'is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.' Monroe v. Pape, 365 U.S. 167, 183 [, 81 S.Ct. 473, 482, 5 L.Ed. 2d 492] (1961); . . ." (Citing also McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed. 2d 622 (1963); Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968)).

See also Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

In Rodriguez and United States ex rel. Rodriguez McGinnis et al., 456 F.2d 79 at 80 (2d Cir. 1972), the Court of Appeals, explicitly following *Wilwording,* held that where a petition is properly brought under 42 U.S.C. § 1983 a federal court cannot require exhaustion of state judicial remedies even if those remedies are available. (Opinion of Chief Judge Friendly). The rule of *Wilwording* and *Rodriguez* applies here. The case is properly brought under 42 U.S.C. § 1983 alleging clear, definable and discrete deprivations of constitutional rights.

■ These considerations are dispositive. But even if they did not apply, the instant case is not properly classified as a habeas corpus matter. Plaintiffs here seek merely a limited determination of dangerousness as a prerequisite to retention at Matteawan. Granting the relief they seek will not result in their release from custody. To secure freedom they must, as the convening judge said, traverse two gates: a determination of non-dangerousness and a finding of competence. Since the instant proceeding does not relate to competence, they will not, by virtue of any relief se-

cured here, be released from custody. If found dangerous, they will be retained in custody at Matteawan. If not found dangerous, they will be transferred to custody in a Mental Hygiene Department hospital. Accordingly, the case is governed by the rule of Sostre v. Mc-Ginnis, 442 F.2d 178, 182 (2d Cir. 1971), that "because Sostre 'is not challenging the validity of his sentence with the ultimate object of obtaining release' from prison, Hancock v. Avery, 301 F.Supp. 786, 791 (M.D.Tenn.1969), his Section 1983 petition is clearly not a mere sham procedure to avoid the exhaustion requirement of the federal habeas corpus statute, 28 U.S.C. § 2254(b) (c)."

### B. *Commitment Provisions*

■ As we have pointed out above, under the old statutory scheme New York provides jury trial as to dangerousness for those not charged with crime and those acquitted by reason of mental defect, and jury trial as to competence for convicted persons. Under the new statute all such classes, as well as persons charged with misdemeanors but who have not stood trial, are entitled to jury trial as to dangerousness. Plaintiff class is not accorded any of these rights by either statute.

Such differentiation between the protections afforded the plaintiffs and other classes violates the equal protection clause unless rationally based or prompted by a compelling state interest.

As the Supreme Court stated in Baxstrom v. Herold, 383 U.S. 107, 111, 86 S.Ct. 760, 763, 15 L.Ed.2d 620 (1966), a seminal case dealing with the rights of mentally ill convicts:

> "Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made . . . For purposes of granting judicial review before a jury of the question whether a person is mentally ill and in need of institutionalization, there is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal term from all other civil commitments."

In the light of *Baxstrom,* we can find no rational basis or compelling interest which justifies the protection of all others from commitment to Matteawan without a jury trial as to dangerousness but denies that right to the plaintiffs. If, as the Supreme Court has said in *Baxstrom,* there is "no conceivable basis for distinguishing" the case of a convict from a nonconvict, there is even less basis for distinguishing the case of a person indicted but untried and unconvicted. Even if we assume, arguendo, that the Constitution does not require a jury trial to determine dangerousness, New York, having granted it in all other cases, must justify the denial to plaintiffs and it has failed to do so. The state claims that a rational basis for distinct treatment of the plaintiff class may be found, for example, in the observation of the Court of Appeals of this Circuit in United States ex rel. Schuster v. Herold, 410 F.2d 1071, 1084 (2d Cir. 1969), cert. den. 396 U.S. 847, 90 S.Ct. 81, 24 L.Ed.2d 96 (1969), that

> ". . . § 85 of the Mental Hygiene Law provides that before being committed to Matteawan, there must be a judicial determination that the individual to be committed is dangerous to himself and others. Such a procedure may not be appropriate for a prisoner because the additional security facilities of Matteawan or Dannemora might be thought necessary to confine convicts with sentences still to serve, who may be more prone to escape from a hospital than civilians."

The state argues that, as in cases of convicts serving a sentence, persons indicted for felony may be "more prone to escape" than others, thus justifying the difference in treatment. The rationale is unpersuasive. First, the plaintiffs here have never been tried, let alone convicted. Indictment alone affords no predicate for a presumption as to their dangerousness. The Supreme Court has instructed in Leary v. United States

(1969), 395 U.S. 6 at 36, 89 S.Ct. 1532, at 1548, 23 L.Ed.2d 57, that a presumption is " 'irrational' or 'arbitrary,' and hence unconstitutional, unless it can at least be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend." The state has made no showing, and it is unlikely that any showing can be made, that dangerousness can be said to flow from the fact of indictment alone—particularly when it is remembered that there are as many non-violent crimes as violent and that neither of the statutes with which we are dealing makes any distinction as to the type of felony which might support a presumption of dangerousness. Moreover, both statutory schemes actually afford convicted prisoners the right to a jury trial to determine dangerousness, and it can more logically be presumed that a convicted person rather than a non-tried and non-convicted person is dangerous. The reasonableness of this view is attested to by the Report of the Special Committee on the Study of Commitment Procedures and the Law Relating to Incompetents of the Association of the Bar of the City of New York, Mental Illness, Due Process, and the Criminal Defendant (1968), at 101 (cited with approval in Schuster v. Herold, supra, 410 F.2d at 1078):

> "Defendants accused but not yet convicted of crime should be treated as civil patients. Apart from the interference with personal liberty occasioned by a denial or requirement of bail and his obligation to appear for trial, a citizen loses none of his rights simply because he has been accused, even when the accusation is made by a busy grand jury. The defendant has forfeited none of the rights to vote, to pursue a profession, etc., that a convicted former prisoner may have forever surrendered, but he is treated far less generously when it comes to his need for hospitalization. In our view the state should not continue to view the mere pendency of a criminal charge or indictment as a rational basis for denying these patients the same protection against unnecessary confinement in a central maximum-security correctional institution which is given to every other patient not actually serving a penal sentence—a judicial determination of dangerous mental illness."

In any event, whatever claim of rational distinction might otherwise be justified is disproved by the fact that under both laws persons who have been acquitted on the ground of mental disease or defect are afforded a jury trial as to dangerousness as a condition to commitment to Matteawan, but plaintiffs' class is not. Whether judged by the test of rationality or compelling state interest, such a distinction is unjustified.

In Baxstrom v. Herold, supra, the Supreme Court held unconstitutional the then existing distinction in treatment between mentally ill convicts and other persons. The state there argued that it was "reasonable to classify persons in Baxstrom's class together with those found to be dangerously insane since such persons are not only insane but have proven criminal tendencies as shown by their past criminal records." Id., 383 U.S. at 114, 86 S.Ct. at 764. Rejecting the argument, the Court observed:

> "We find this contention untenable. Where the State has provided for a judicial proceeding to determine the dangerous propensities of all others civilly committed to an institution of the Department of Correction, it may not deny this right to a person in Baxstrom's position solely on the ground that he was nearing the expiration of a prison term. It may or may not be that Baxstrom is presently mentally ill and such a danger to others that the strict security of a Department of Correction hospital is warranted. All others receive a judicial hearing on this issue. Equal protection demands that Baxstrom receive the same." Id., at 114–115, 86 S.Ct. at 764.

■■ There is no basis for our abstaining from a determination of this

issue, as the state requests. Both the old and the new statutes are clear on their face. They simply do not afford the plaintiff class the same protections as are granted to others.[5] The situation is governed by the observation in Wisconsin v. Constantineau (1971), 400 U.S. 433 at 439, 91 S.Ct. 507, at 511, 27 L. Ed.2d 515:

"There is no ambiguity in the state statute. There are no provisions which could fairly be taken to mean that notice and hearing might be given under some circumstances or under some construction but not under others . . . Hence the naked question, uncomplicated by an unresolved state law, is whether that Act on its face is unconstitutional. As we said in Zwickler v. Koota, 389 U.S. 241, 251 [, 88 S.Ct. 391, 397, 19 L.Ed.2d 444], abstention should not be ordered merely to await an attempt to vindicate the claim in a state court. Where there is no ambiguity in the state statute, the federal court should not abstain but should proceed to decide the federal constitutional claim. *Id.*, at 250–251 [, 88 S.Ct. at 396–397, 19 L.Ed.2d 444]. We would negate the history of the enlargement of the jurisdiction of the federal district courts, if we held the federal court should stay its hand and not decide the question before the state courts decided it."

Our holding that the failure of the statutes to grant plaintiffs a jury trial on determination of dangerousness violates the equal protection clause makes it unnecessary for us to determine

whether or not that deficiency might also violate the due process clause or the Sixth Amendment's provision for jury trial in all criminal prosecutions.

In his earlier opinion, to which reference is made, the convening judge pointed out that at least one federal court (United States v. Curry, 410 F.2d 1372 (4th Cir. 1969)) has held, as to the analogous federal provisions, that they would violate the due process clause of the Fifth Amendment if not so construed as to require (for extended confinement)[6] a determination that defendant, if released, might be a public or private danger. Assuming, arguendo, that due process requires a finding of dangerousness before an untried accused person may be confined for an extended period because of mental incompetence, the CCP, which contains no such requirement, may be constitutionally suspect. Section 730 of the new CPL does require such a finding by adjudication, even for plaintiffs' class, and meets the *Curry* test in that regard. However, a determination that due process requires a finding of dangerousness for prolonged holding does not compel the conclusion that it requires a jury determination of the issue. Indeed, the federal scheme, 18 U.S.C. § 4244ff, makes no provision for jury determination of dangerousness and has been upheld, at least by implication, in Greenwood v. United States, 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412 (1956), and *Curry*, supra.

In any event, we find it unnecessary to determine whether the New York statutory schemes violate either the due

5. It is clear that the omission from the new statute of a provision for jury trial as to dangerousness for the plaintiff class was deliberate. The legislature had before it the recommendation of the Special Committee on the Study of Commitment Procedures and the Law Relating to Incompetents of the Association of the Bar of the City of New York (text, supra) that

"Defendants accused but not yet convicted of crime should be treated as civil patients."

The failure to provide such protection to the plaintiff class must therefore be

construed as a conscious legislative decision, eliminating the possibility of a judicial constructon reading the right to a jury trial into the new law.

6. The *Curry* court qualified its decision by stating, 410 F.2d at 1374:

"The [trial] court may, of course, detain him for a reasonable time to observe and otherwise inquire into his propensities, and also to treat him for his illness in the hope of restoring competency."

process clause of the Fourteenth Amendment or the Sixth Amendment's provision for trial by jury, and we decline to do so, particularly since the Supreme Court has granted certiorari to determine the issue in Jackson v. Indiana, 255 N.E. 2d 515, 519 (Ind.1970), cert. granted 401 U.S. 973, 91 S.Ct. 1203, 28 L.Ed. 2d 322 (1971).

### C. *Miscellaneous Provisions*

■ We turn now to the questions raised as to the sections of the statutes which accord special treatment to non-residents, which require the District Attorney's consent to motions for dismissal of the indictment, and which (in the CPL) appear to require members of the plaintiff class, as distinguished from others, to make an affirmative request for a hearing as to dangerousness. Since we believe that these provisions may be construed by the state courts so as to avoid determination of constitutional questions by this court, we conclude that, under the rule of Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), Harrison v. NAACP, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959), and Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L. Ed.2d 68 (1970), we should abstain, retaining jurisdiction pending the disposition of the claims by the New York courts.

We recognize that both the Supreme Court and the Court of Appeals of this Circuit have declared that the doctrine of abstention ought to be invoked "only in narrowly limited 'special circumstances,'" Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967) (as repeated in Reetz v. Bozanich, supra); Wright v. McMann, 2 Cir., 387 F.2d 519, 524 (1967); but in our view the questions raised as to the "miscellaneous provisions" fall within that area.

We are also aware that when a federal court abstains it usually permits a state court to decide all the issues of the case in the first instance; but we do not believe the all or nothing approach is appropriate here, and the law does not require it. Our reason for declining to abstain from a determination of the question presented by the commitment provisions, on the one hand, while abstaining from a disposition of the miscellaneous provisions on the other, is, as we have indicated above, that the commitment provisions are so clear and unambiguous on their face that no construction by a state court can save their constitutionality or avoid the constitutional question, while this is not so of the miscellaneous provisions. Furthermore, bearing in mind the undisputed 'rigors' of confinement at Matteawan, we believe that commitment to that institution in violation of plaintiffs' rights to equal protection urgently requires correction which ought not be delayed while plaintiffs seek relief *de novo* in the state courts; but if any deprivation of rights under the miscellaneous provisions exists, it is not causing immediate substantial harm to the plaintiff class. Our affirmative reasons for abstaining as to the miscellaneous provisions follow:

(i) Where, as here, no prior construction has been sought from the state court as to the validity of § 662–b(3) of the Code Cr.Proc. and Article 730.60(6) of the CPL, which permit out-of-state residents to move for dismissal of the indictment substantially earlier than a New York State resident, the abstention cases cited clearly instruct that the state court should be afforded a reasonable opportunity to pass on the question presented: whether there is a rational basis for the distinction in treatment.

(ii) The question whether the consent of the District Attorney is still required to permit motions to dismiss the indictment is an issue which clearly requires construction by the state courts. Indeed, the apparent bar to such a motion under the old statute has been held unconstitutional by a lower New York court (Neely v. Hogan, supra), and the Practice Commentary to the new provisions (CPL § 730.60(5) and (6)) construes the requirement to have been eliminated in the new statute. The status and history of the provisions fall clearly within the

*Pullman* rule, reiterated in *Reetz,* supra, 397 U.S. at 86, 90 S.Ct. at 790, that the federal court should abstain where "the issue of state law is uncertain."

(iii) Finally, we believe that the provisions of the new statute (CPL §§ 730.-50(2) and 730.60(4)) which seem to require that persons (such as plaintiffs) already in the custody of the Commissioner, but not adjudicated dangerous, must make an affirmative request for a hearing as to dangerousness, while other persons receive hearings without request, may well be clarified by the state courts with resultant avoidance of constitutional questions. The New York courts have on more than one occasion read into the Mental Hygiene Law a requirement for hearings. Matter of Buttonow, 23 N.Y. 2d 385, 297 N.Y.S.2d 97, 244 N.E.2d 677 (1968); People v. Lally, supra. We believe that the New York courts' prior careful attention to protection of the mentally ill is assurance that equal care will be bestowed by them under the circumstances presented here. Furthermore, it may well be that, as a result of our determination that members of the plaintiff class are entitled to a jury trial as to dangerousness, the question whether they would otherwise have to make an affirmative request for a hearing has been rendered moot.

## V.

■ There remains for determination the question whether the case should be designated as a class action. We find that it should. The requisite elements are present. The demands of Rule 23(a), F.R.Civ.P., are met. The class numbers between 400 and 500. The questions of law common to the class are the constitutionality of Code Cr.Proc. § 662–b and CPL Article 730. There is no doubt that the claims of plaintiffs are typical of the class and that plaintiffs (who have been represented with great competence and vigor) will adequately protect the class interest. The suit is maintainable as a class action under Rule 23(b) (2) and (3), F.R.Civ.P. The defendants have acted on grounds generally applicable to the class in enforcement of the provisions of the CCP and the CPL by which the plaintiffs and class members are confined at Matteawan. Injunctive and declaratory relief with respect to the class as a whole are appropriate. The questions of law common to the class predominates over other questions, and, in view of the numbers involved, a class action is clearly superior to other methods for fair and efficient adjudication of the controversy.

### Conclusion

For the reasons stated we find that the provisions of § 662–b of the New York Code of Criminal Procedure and of § 730.60(1) of the Criminal Procedure Law of the State of New York are unconstitutional because they violate the right to equal protection of plaintiff class' right to equal protection by failing to provide its members with a jury trial to determine dangerousness as a condition to confinement in hospitals operated by the Department of Correction. We enjoin the defendants, their employees, agents, successors, and all persons in active concert and participation with them from enforcing these provisions without according to the plaintiff class a jury trial as to determination of dangerousness under conditions equivalent to those accorded by the laws of New York to other mentally ill persons.

The case is designated as a class action, and the class is defined as "all persons found incompetent to stand trial and committed to hospitals under the jurisdiction of the Department of Correction under § 662–b of the Code of Criminal Procedure and Article 730 of the Criminal Procedure Law of New York."

We abstain from a determination of the other questions presented by plaintiffs, retaining jurisdiction of those issues pending their disposition by the courts of New York.

Submit order on notice.

MOORE, Circuit Judge (dissenting).

In my opinion, the federal courts are without jurisdiction to pass upon the

merits of plaintiffs' complaint. Despite references in the complaint to the Civil Rights Act, 42 U.S.C. § 1983, the relief sought is actually by way of habeas corpus. Jurisdiction fails because plaintiffs have not exhausted State remedies as required by 28 U.S.C. § 2254(b).

In the light of the two recent pronouncements of the Supreme Court in Picard v. Connor, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) and Humphrey v. Cady, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), jurisdiction must be recognized as the keystone in the arch at the entranceway to the federal courts. Yet the majority either disregard, or by judicial legislation repeal, the jurisdictional requirements of 28 U.S.C. § 2254(b). That section specifies that the applicant for "a writ of habeas corpus" be "in custody pursuant to the judgment of a State court," that the writ shall not be granted "unless it appears that the applicant has exhausted the remedies available" in the State courts and that such available State corrective processes are ineffective.

The Supreme Court reaffirmed the vitality of these requirements in saying that "a state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus." (*Picard*, 404 U.S. p. 275, 92 S.Ct. p. 512). "The exhaustion of state remedies doctrine" has been codified in § 2254(b) and "reflects a policy of federal-state comity" the purpose of which is "to give the State an initial 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." (*Id.* p. 275, 92 S.Ct. p. 512). The Supreme Court apparently is stating a policy still in force and effect when it writes, "We have consistently adhered to this federal policy, for 'it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional viola-

tion.' "[1] The Court then emphasized the necessity of showing that the person confined must establish that he was given the State courts a first opportunity to pass upon "the same claim he urges upon the federal courts" (*Id.* p. 276, 92 S.Ct. p. 512). The Supreme Court, therefore, reversed the Court of Appeals (434 F.2d 673, 1st Cir., 1970) and, in effect, reinstated the District Court's dismissal of the petition for a writ of habeas corpus.

In *Humphrey v. Cady,* the case was remanded not because § 2254(b) could be disregarded but because it was not clear as to "precisely what claims were presented in the state habeas petition." 404 U.S. 1055, 92 S.Ct. 1055 fn. 17 (1972). The Court limited § 2254(b) in its application to those situations where State remedies were still open to the applicant. But in *Humphrey* relief had been sought in the State courts; it was merely a question of what issues had been presented. Here, however, no opportunity has been given to the State courts to correct constitutional deficiencies.

The majority hold that the Supreme Court in Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971) held that "whether or not petitioners had exhausted state remedies, they were entitled to proceed under the Civil Rights Act." However, a mere allegation that the proceeding is brought under the Civil Rights Act does not thereby render § 2254(b) and its requirements inapplicable. Nor could the Supreme Court have decided *Picard,* as it did just six days after *Wilwording* if it had intended to rule that any person who can sue under § 2254 may also sue under § 1983, thereby avoiding all exhaustion prerequisites.

In Smith v. Follette, 445 F.2d 955 (2d Cir. 1971), a prisoner sued the Warden, alleging that as an addict he was entitled to addiction treatment on equal protection grounds, that New York law granted treatment to addicts guilty of

---

1. Quotation from Darr v. Burford, 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950).

a misdemeanor but only to convicted felons in the sentencing court's discretion. Judge Kaufman in his concurring opinion stated:

> . . . I believe that these applications are essentially habeas corpus petitions, requiring exhaustion of state remedies, . . . . Each petitioner is " 'challenging the validity of his sentence with the ultimate object of obtaining release' from prison, . . . Petitioners are not seeking release only incidentally to a claim that actions of prison parole, or other correctional authorities are illegal. . . . It is the historic and essential function of the habeas corpus petition to afford relief from confinement *unlawfully imposed*. . . . Thus, there is no reason for denying their natural meaning to the words of 28 U.S.C. § 2254, that a writ of habeas corpus may be entertained by a federal court "in behalf of a person *in custody pursuant to the judgment of a State court* . . . on the ground that he is in custody in violation of the Constitution . . . ." Nor is it of any moment that part of the remedy sought by petitioners is not outright freedom from all confinement, but rather transfer from a state penal institution to another institution for treatment of their addiction. Outright freedom is not the only remedy available by a writ of habeas corpus.

*Id.* at 962 (emphasis in original).

In this case plaintiffs are not protesting the conditions of their confinement but the lawfulness of the procedure by which they were confined to Dannemora and Matteawan.

Just as prisoners seeking a determination that their custody is violative of law have been traditionally required to exhaust, so petitioners in custody in a mental hospital alleging that their continued confinement is violative of law have been traditionally required to exhaust. *See* United States ex rel. Antczak v. Superintendent, 354 F.2d 635 (7th Cir. 1965) (relator claimed that he was no longer insane); Williams v. Dalton, 231 F.2d 646 (6th Cir. 1956) (section 1983

action claiming that commitment to mental hospital without adequate hearing violative of fourteenth amendment dismissed for failure to exhaust); Gidney v. Sterling, 202 F.Supp. 344 (E.D.Ark. 1962) (exhaustion required of petitioner claiming that his commitment violative of due process in that he was not afforded counsel nor was he permitted to call medical witnesses to testify); United States ex rel. Spinks v. Zeller, 188 F. Supp. 767 (N.D.W.Va.1960) (petitioner's claims that the procedures by which he was hospitalized violated due process dismissed for failure to exhaust); Miller v. Director, 146 F.Supp. 674, 679–80 (S.D. N.Y.1956) (Kaufman, J.) aff'd on opinion below, 243 F.2d 527 (2d Cir. 1957) (petitioner's claims that he was committed while sane and that the procedures by which he was committed were violative of Constitution dismissed for failure to exhaust).

The New York State legislature, the State courts, and the Bar have all manifested a sensitivity to the legal procedures leading to the confinement of the mentally ill. We should permit the State courts to have the initial opportunity to pass upon and correct the alleged violations of these petitioners' federal rights. Petitioners can clearly seek habeas corpus in the State courts and challenge their commitment on the same grounds they urge here. *See* N.Y.Const. art. 1, § 4; People ex rel. Brown v. Johnston, 9 N.Y.2d 482, 485, 215 N.Y.S.2d 44, 46, 174 N.E.2d 725, 762 (1961) (" . . . it [the writ] can be invoked to obtain a hearing to test the validity of a commitment in an institution for the criminally insane."); People ex rel. Ciavarelli v. Herold, 32 A.D.2d 692, 300 N.Y S.2d 7 (3d Dep't 1969), aff'd mem., 27 N.Y.2d 826, 316 N.Y.S.2d 435, 265 N.E 2d 257 (1970).

Moreover, the State courts have manifested an awareness of the constitutional requirements attending the procedures by which the mentally ill are confined. For example, in *People v. Lally* the Court of Appeals *read into* section 454 of the old Code of Criminal Procedure all of

the procedural safeguards of sections 74 and 85 of the Mental Hygiene Law including jury trial for defendants acquitted by reason of insanity before they can be committed to a State mental hospital. People v. Lally, 19 N.Y.2d 27, 34–35, 277 N.Y.S.2d 654, 660, 224 N.E.2d 87, 92 (1966). See also Fhagen v. Miller, 29 N.Y.2d 348, 353–356, 328 N.Y.S.2d 393, 397, 278 N.E.2d 615, 618 (1972) (". . . since due process is not a concept to be rigidly applied, it is not offended if notice and a hearing follow confinement of a mental patient in an urgent case, *as long as he is given the opportunity, within a short time, to litigate the question of his mental illness.*" (emphasis added)); In re Buttonow, 23 N.Y.2d 385, 393–394, 297 N.Y.S.2d 97, 103–104, 244 N.E.2d 677, 682 (1968) (*reading into* section 71 of the Mental Hygiene Law that a mentally ill patient, converted from involuntary to voluntary status, be accorded the right to judicial hearing and review of his change in status); In re Coates, 9 N.Y.2d 242, 252, 213 N.Y.S.2d 74, 82, 173 N.E.2d 797, 803 (1961) (*reading into* section 76 of the Mental Hygiene Law a requirement that notice of a right to demand a jury trial on incompetence means *actual* notice).

The stressing of any jurisdictional requirement provokes the questions: What difference does it make? The New York courts will undoubtedly recognize the lack of equal protection in the legislation, therefore, why subject the petitioners and the New York courts to further litigation when we, the federal courts, by the exercise of their overriding power, can declare the New York laws unconstitutional? But what then becomes of the fact that federal courts are courts of limited jurisdiction under the same Constitution invoked here? Of course, it would be easier to abolish jurisdictional requirements entirely. The Supreme Court could open its doors to all by not requiring a Jurisdictional Statement. But so long as jurisdictional standards have been set by legislative bodies, they should be honored. When legislatures choose to enact a law which provides that any person who lives within ten miles of any courthouse may seek justice there without regard to the nature or amount of the controversy, a jurisdictional Utopia of sorts may be achieved although I very much doubt it. In short, I would hold that plaintiffs must establish that they have met the requirements of § 2254(b). After all it is not unseemly to impose this burden if federal-state comity is to have any meaning. The plaintiffs are charged with New York crimes, they are confined in New York institutions pursuant to New York court orders, the New York legislature has enacted the laws relating to their incarceration and the New York courts have shown themselves to be mindful of the many situations affecting the confinement of the allegedly mentally ill. Why then is it inappropriate to permit the New York courts to have "the initial 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." ? *Picard,* 404 U.S. p. 275, 92 S.Ct. p. 512. I would follow *Picard* and dismiss the complaint.