OPINION OF THE COURT
Leo Brown, J.
The petitioner (defendant) moves for an order granting him civil status pursuant to Jackson v Indiana (406 US 715).
A Jackson hearing was held on August 15, 1977.
Petitioner was indicted in Queens County for murder in the first degree on May 13, 1964. Thereafter, he was committed to Matteawan State Hospital in June of that year as incompetent to stand trial. He was transferred to Creedmoor State Hospital in December, 1973 and is presently undergoing treatment at that institution. Orders of retention were signed by various Queens Supreme Court Justices on June 14, 1972, November 14, 1973 and October 29, 1975.
The petitioner contends that he has been confined in a criminal capacity for more than 13 years without being brought to trial and now seeks conversion to civil status alleging that his constitutional rights of equal protection and due process have been violated under the standards enunciated in the Jackson Supreme Court decision. Petitioner, in this proceeding is represented by the Mental Health Information Services; the People are represented by an Assistant District Attorney and Creedmoor State Hospital by the Attorney-General.
At the outset, petitioner’s counsel maintains that the issues before this court are: (1) the patient’s present mental state; (2) if incapacitated, is there a reasonable possibility that he will regain competency to stand trial in the foreseeable future; and (3) if not, due process demands that petitioner be granted civil status.
Respondent, however, contends that in addition to those elements this court must consider the question of dangerous *375 ness, and maintains that if the petitioner is presently dangerous the Jackson doctrine does not apply.
In addition to this dispute over issues, both sides disagree as to the standard of proof applicable to a Jackson hearing — that is, whether proof must be beyond a reasonable doubt or merely by a preponderance of evidence. Further, both sides appear to be in agreement on the proposition that whatever the burden of proof is, it is on the other side. Hence, this court must, at the outset, determine what issues are applicable to a Jackson hearing, the standards of proof, and who bears the burden of proof.
i.
THE NATURE OF A JACKSON HEARING
In order to crystallize the issues, the court initially considers the doctrine enunciated in Jackson v Indiana. That case dealt with a deaf mute defendant who could not read, write or communicate but who was charged with two criminal offenses. The defendant was examined by two psychiatrists pursuant to Indiana statute and they found him unable to understand the charges against him. The Indiana court found Jackson was incompetent and committed him to the care of the Department of Mental Health until such time as "the defendant is sane”. On appeal, Jackson’s attorney argued that this commitment, in effect, amounted to a life sentence without Jackson’s ever having been convicted of a crime. The United States Supreme Court ultimately agreed and stated (p 738): "We hold, consequently, that a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant. Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal.”
The court reasoned that (p 738): "At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individ *376 ual is committed”; and (p 730) "[B]y subjecting Jackson to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses * * * Indiana deprived petitioner of equal protection of the laws under the Fourteenth Amendment.”
Basically, the Supreme Court determined that once the purpose of a defendant’s confinement no longer existed, his hospitalization should be measured by civil standards like any other patient’s. The purpose for his initial hospitalization would no longer exist upon a finding that there was no substantial probability that the defendant would recover capacity to stand trial in the foreseeable future.
Initial attempts were made to distinguish our criminal commitment laws from those of Indiana but these distinctions have been rejected by our courts. Thus, in People ex rel. Anonymous v Waugh (76 Misc 2d 879, 881), the court noted that "[respondent seeks to distinguish Jackson upon the ground that the Indiana statute * * * did not make provision for periodic review and for a maximum period of commitment * * * However, these provisions do not meet the standard laid down in Jackson * * * Obviously, the CPL 730.50 standards for retention bear no relationship to the purposes of the retention.”
Again, in People v Lee (83 Misc 2d 35), the court ruled that CPL 730.50 does not meet constitutional standards unless the holding of Jackson is read into that section. The principles enunciated in Jackson have been followed in the New York decisions, to wit, People ex rel. Anonymous v Waugh (supra), People v Anonymous (76 Misc 2d 884), People v Lee (supra), and People v Arendes (86 Misc 2d 468).
With this background in mind, this court notes that there is no way of ascertaining whether a defendant is competent to stand trial in the future without first determining whether he is presently fit to proceed to trial. To consider a Jackson proceeding as no more than an expanded competency hearing is, of course, an over-simplification. The issues involved in the former are far more complex. However, since one does evolve out of the other, a Jackson hearing should logically follow the same standards as a fitness proceeding. Hence, this court will apply the same procedural rules as are set forth in CPL 730.50 to the present application.
*377 II.
THE STANDARD OF EVIDENCE
The standard of evidence in a CPL article 730 competency hearing has been held by the Appellate Division, Second Department, to be by a preponderance of evidence (People v Santos, 43 AD2d 73). In that case, the court reasoned that the interest of justice does not require proof beyond a reasonable doubt but is satisfied merely by establishing proof by the preponderance of the evidence.
In a recent case (Matter of Lublin v Central Islip Psychiatric Center, 56 AD2d 1), the court dealt with a competency hearing under CPL 330.20, that is, one dealing with the commitment, confinement and release of a defendant acquitted on the grounds of mental disease or defect, and the Appellate Division ruled that the burden of proof was similarly to be by a preponderance of the evidence.
This court holds, therefore, that even though a Jackson hearing is criminal in nature, the burden of proof applicable to a competency hearing should apply, namely, by a preponderance of the evidence and not beyond a reasonable doubt.
iii.
THE BURDEN OF PROOF
In considering the burden of proof, this court notes that the Jackson case speaks of a person charged by the State and committed by the State; it stresses the State’s duty either to convert the person to civil status or to release him. Further, in a series of civil proceedings in which an individual’s hospitalization and need for treatment is at issue, the courts have ruled that the burden is on the State. (See People v Santos, supra, Matter of Lublin v Central Islip Psychiatric Center, supra.) Also, in Lublin, the Appellate Division quoted from and emphasized a New Jersey case, State of New Jersey v Krol (68 NJ 236, 248), in which the New Jersey court interpreted Jackson v Indiana by stating: "the state must make a meaningful factual determination as to whether defendant actually meets the standard for commitment.”
In addition, it would be paradoxical in the extreme for a rule of law to declare a man legally incompetent and yet still rational enough to have him prove his present mental state. In this connection, the Supreme Court of Illinois in People v Bender (20 Ill 2d 45, 53-54) commented: "It would be a strange *378 rule, indeed, to impose upon [the defendant] the burden of proving his own incompetence, for the very disability which he would be seeking to prove renders him incapable, either logically or legally, of sustaining the burden of proof.”
Thus, this court is of the opinion that in a Jackson hearing the burden of proof is upon the People once the petitioner raises the inital question of his status.
iv.
THE QUESTION OF DANGEROUSNESS
The District Attorney maintains 6that a finding that the incompetent is a dangerous person bars Jackson relief. He bases this contention on three grounds. The first is that the New York cases cited by petitioner concern themselves with patients found to be nondangerous. The second is that the Jackson case itself is silent on the issue of dangerousness; hence, the case sets no precedent for changing established New York policy. The final ground points to the fact that the New York courts have in the past taken into consideration the element of dangerousness and although the statute on which this finding was permitted has now been modified, the courts still possess inherent power to evaluate this issue independently.
The attorneys for both Creedmoor and petitioner challenge this position. They maintain that there is no issue of dangerousness in a Jackson hearing since this finding is not required either by statute or case law. Indeed, petitioner’s attorney cites the Supplementary Practice Commentary to McKinney’s Consolidated Laws of New York (Book 11 A, 1977-1978 Pocket Part, CPL art 730, p 169) which states that "[t]he concept of dangerousness in this article is obsolete”.
As regards prior New York cases, a review of People ex rel. Anonymous v Waugh (supra), People v Anonymous (supra) and People v Arendes (supra) support the People’s first point. The first two cases cited above dealt with nondangerous defendants; the third was silent on the issue.
A review of Jackson establishes that dangerousness was not a factor in that case. While it considered that issue in other contexts, it did not rule on that question in connection with Jackson’s own proceeding. The purpose of a Jackson hearing was limited to determining whether or not there is a substantial possibility that an incapacitated defendant will attain *379 competency in the reasonable future. The court did not go beyond that issue. Hence, the People are correct in their assertion that Jackson has no bearing on the issue of dangerousness as regards New York incompetent defendants.
Finally, a reading of our present statute, namely, CPL article 730, shows that there is no requirement for a finding of possible dangerousness of an incapacitated defendant. It is true that at one time the fitness issue (CPL 730.50) did require a court to determine whether a defendant was "an incapacitated person or a dangerous incapacitated person”. However, on April 14, 1972, the United States District Court in Gomez v Miller (341 F Supp 323, interpreting the expanded concept of equal protection for all mentally ill persons as set forth in Baxstrom v Herold., 383 US 107) declared CPL 730.60 (subd 1) and similar sections unconstitutional because they violated a prisoner’s right to equal protection by permitting jury trials on the issue of dangerousness for all prisoners except those charged with a felony but untried because of incompetency to stand trial. As a result, the Legislature removed the obligation of the courts to determine dangerousness in a criminal case by amending CPL 730.50 (subds 1, 2), effective May 30, 1974 (L 1974, ch 629, § 8). It is to be noted that the Jackson case was not decided until June 7, 1972 so that the amendment removed the issue of danger. Thus, there is now no statutory requirement in New York law presently requiring a finding as to dangerousness in dealing with an incompetent defendant who has been indicted but not yet tried.
The District Attorney acknowledges, in rebuttal, that there is no present New York State danger statute but makes reference to Greenwood v United States (350 US 366 [1956] to support the theory that a court may make a finding without statutory support. In Greenwood the court upheld a Federal statute which permitted the court to commit a person found mentally unfit to stand trial and which required a panel of doctors to determine whether a defendant if released would constitute a danger to the safety of officers, property, or other interests of the United States. However, that finding is a limited one since Jackson clearly restricted the holding which dealt only with the Federal court’s power to initially commit a person when found unfit to stand trial. There is no question in this case about the court’s initial power to commit a defendant. Greenwood furnishes no support, therefore, for the District Attorney’s position that the court possesses an inherent *380 right to consider dangerousness unsupported by statutory authority.
Yet, this court cannot agree with the view that the question of dangerousness is obsolete for all purposes. It is clearly relevant, not in itself, but in its relationship to a patient’s mental condition either as a symptom of mental disorder or part of an underlying illness. If the evidence of violence is so strong as to clearly label a defendant as dangerous, a court should highlight this fact although under our present law the court cannot deny Jackson relief when our Legislature has removed the court’s power to consider dangerousness. Dangerousness as an issue now lies only on the civil side of the law.
v.
THE HEARING
At the hearing, Dr. Rafael Tatlonghari, a psychiatrist at Creedmoor Psychiatric Center, testified as to the patient’s mental status. The doctor first identified petitioner’s medical records which indicated that he had been initially admitted to Kings County Hospital in early 1963 following an indictment on a charge of murder. Thereafter, he was transferred to Matteawan State Hospital on March 16, 1964 and remained continuously at that institution until December 20, 1973. At that time, he was sent to Creedmoor Psychiatric Center pursuant to a Criminal Procedure Law order of retention. He has resided there continuously to the present time, receiving medical treatment.
The hospital records further disclose that prior to his Creedmoor hospitalization, the petitioner had a history of sensory hallucinations in that he constantly heard voices and imagined that he was being visited by deceased members of his family. The records further disclose that the petitioner constantly spoke irrationally and believed that people from another planet controlled him. Dr. Tatlonghari testified that he had studied the petitioner’s prior medical record, reviewed his past psychiatric history, and had observed him in Creedmoor for a period of some seven years although he had personally treated him only in the past month. His observations indicated that the patient is showing progressive deterioration, being withdrawn and seclusive. The patient does not relate well with others and keeps entirely to himself. When questioned, he answers incoherently or just mumbles, being unintelligible most of the time. The doctor added that very *381 frequently the patient would respond to questions with giggles or not answer at all.
Based on his observations and his knowledge of defendant’s prior psychiatric history, Dr. Tatlonghari diagnosed the petitioner as a chronic undifferentiated schizophrenic, and considers him presently incompetent to understand fully the charges against him.
Inquiry was made of the doctor as to whether the petitioner was making any progress towards regaining his capacity to stand trial. The answer was in the negative; nor did the doctor believe that the petitioner would regain his competency in the foreseeable future. When asked how long a period of time the foreseeable future might encompass, the doctor stated that he did not expect any improvement within 10 years or more, barring a medical miracle. In addition, Dr. Tatlonghari believes that different forms of treatment would not aid in any respect.
The question of dangerousness was next raised. As was previously indicated, the court permitted exploration of this area not as an issue of law but for its relevancy on the state of defendant’s mental health. The doctor was uncertain as to whether the petitioner could be classified as dangerous to himself or others but indicated that his unpredictability indicated a potentiality for harm. There always existed the possibility that the patient could respond to his imaginary voices and under their guidance become dangerous to himself or others. In this respect, it might be noted that the record shows that the petitioner has threatened to kill himself and past competency hearings have indicated that other doctors have considered him dangerous.
Based upon the petitioner’s prior medical history and the psychiatrist’s diagnosis and prognosis, this court finds that: (1) petitioner has been confined to State mental institutions for over 13 years solely because of his incapacity to stand trial; (2) petitioner presently suffers from a severe mental illness diagnosed as chronic schizophrenia which renders him incompetent to understand the nature of the charges against him; (3) petitioner is not making any progress towards competency but appears to be actually deteriorating; nor does there seem to be any medical hope for future progress.
Accordingly, this court concludes that since a reasonable time has passed in which to evaluate petitioner’s mental condition and he is still presently incompetent, possesses no *382 substantial likelihood of attaining fitness in the foreseeable future, and is making no progress towards that goal, due process demands conversion to civil status.
However, in returning the defendant to civil status, this court is aware of his past history and the possibility that he might inflict harm on himself or others. Since the law, as presently written, prohibits retention in a criminal institution on the sole ground of dangerousness, it is now most strongly recommended that the petitioner be transferred to a civil institution which is able to supervise and treat potentially dangerous inmates. The Department of Mental Hygiene and the Mental Health Information Services are therefore reminded of sections 57.1 and 57.2 of the New York Code of Rules and Regulations (14 NYCRR 57.1, 57.2) which provide for the transfer of potentially harmful patients to Mid-Hudson Psychiatric Center.
Section 57.1 of that code provides that "the Mid-Hudson Psychiatric Center is a hospital * * * which offers a range * * * of * * * services for the care, treatment, and rehabilitation of the mentally ill * * * In addition, it has the staff and physical surroundings to enable it to offer * * * services to patients requiring closer supervision than can be given at other hospitals. Patients whose behavior is such as to raise the likelihood of their giving harm to others”.
Section 57.2 outlines the procedure for transfer of an involuntary patient to such facility if the application is supported by facts showing "a substantial risk that such patient may cause physical harm to other persons”. Treatment at such an institution would not only prove beneficial to the petitioner but would negate any possibility of harm because of his condition.
The application to convert to civil status pursuant to article 31 of the Mental Hygiene Law is consequently granted.